**MILLER BREWING COMPANY,**
**Plaintiff,**

v.

**CARLING O'KEEFE BREWERIES OF CANADA, LTD. and Taft Broadcasting Company, Defendants.**

**No. Civ. 78–148.**

United States District Court,
W. D. New York.

June 6, 1978.

Conboy, Hewitt, O'Brien & Boardman,
Anthony L. Fletcher, of counsel, New York

**434**

City, Jaeckle, Fleischmann & Mugel, David J. Calverley, of counsel, Buffalo, N. Y., for plaintiff.

Nims, Howes, Collison & Isner, Oliver P. Howes, Jr., of counsel, New York City, Cohen, Swados, Wright, Hanifin, Bradford & Brett, Jay E. Brett, of counsel, Buffalo, N. Y., for defendant Carling.

Diebold & Millonzi, Leonard Kriss, of counsel, Buffalo, N. Y., for defendant Taft.

## MEMORANDUM and ORDER

ELFVIN, District Judge.

■ Miller Brewing Company ("Miller") complained against Carling O'Keefe Breweries of Canada, Ltd.,[1] ("Carling") and Taft Broadcasting Company ("Taft") alleging that the broadcasts of three television commercials which advertise and promote Carling's HIGHLITE low calorie beer by a federally licensed television station (WGR–TV) owned and operated in Buffalo in the Western District of New York by Taft constituted copyright infringement, trademark infringement and unfair competition. Miller has moved for a preliminary injunction to restrain the broadcasting of such commercials pending the resolution of the instant action on the merits.[2]

Miller is engaged in the business of brewing, marketing and selling alcoholic beverages—beer, ale and malt liquor—primarily in the United States. It is currently the second largest brewer and seller of beer in this country, marketing its HIGH LIFE, LITE and LOWENBRAU brands. Recently Miller has been the fastest growing major brewery in the United States. Its most successful brand, and also its oldest, is Miller HIGH LIFE which is a nationally marketed premium beer sold throughout the United States and in the Canadian province of Alberta. Miller HIGH LIFE is not sold anywhere else in Canada. It is alleged that this brand of beer is referred to by consumers as Miller HIGH LIFE, Miller or HIGH LIFE. It has been heavily and extensively advertised on national television and in print under the overall "Miller time" theme. Miller's advertising expenditures for Miller HIGH LIFE exceeded twelve million dollars in 1973, thirteen million in 1974, fifteen million in 1975, eighteen million in 1976 and twenty million in 1977. Miller HIGH LIFE's sales record has been very successful in recent years with sales increasing steadily from five million barrels in 1973 to fifteen million barrels in 1977.

Beginning in May 1967, a reduced calorie beer had been brewed in the United States by a Chicago brewer, Meister Brau, Inc. In 1972, Miller acquired certain of the trademarks, recipes and registrations of Meister Brau, including its LITE brand. Meister Brau had marketed and sold LITE on a regional basis in the United States until July 1972 and Miller continued brewing and selling LITE in its then current packaging until 1974. In 1973, Miller had decided that reduced calorie, less filling beer had con-

---

1. The instant action was originally brought against Carling O'Keefe, Ltd., a Canadian corporation, which moved to dismiss for lack of personal jurisdiction. At oral argument on the instant motion, the parties stipulated on the record to the substitution of Carling O'Keefe Breweries of Canada, Ltd., also a Canadian corporation, in its stead. Therefore, said motion is hereby denied as moot. Hereafter the title to the within action will reflect such substitution, as above.

2. At oral argument, Taft stipulated on the record that it would not broadcast any of the alleged infringing HIGHLITE commercials until a determination is reached on Miller's motion. The contract between Carling and Taft had expired March 31, 1978. Taft, however, at oral argument made clear that it was not consenting to refrain from broadcasting such commer-

cials until resolution of the case on the merits. In this posture, Miller's application for preliminary relief has not been mooted as to Taft, which in effect has merely consented to the entry of an open-ended temporary restraining order pending my determination of Miller's motion for a preliminary injunction. See, Fed.R. Civ.P. rule 65(b). Furthermore, Carling of course has been free to contract with other television stations for the broadcast of such commercials and, on at least two occasions (April 18 and 20, 1978) since the matter now before me was submitted for decision, at least one of the commercials in question was aired on another Buffalo television station. In addition, a fourth HIGHLITE commercial has been shown at several times on a Buffalo television station since the instant motion was submitted.

siderable unrealized profit potential and "restaged" LITE with a new recipe, new packaging and a new marketing-advertising approach. In January 1975, after introducing this brand in several test markets, Miller began marketing and selling its "new" LITE on a national basis throughout the United States. It is not marketed or sold anywhere in Canada at the present time. Miller's LITE beer has been heavily advertised with expenditures exceeding ten million dollars in 1975, twelve million in 1976, and fifteen million in 1977. LITE's sales record reflects Miller's successful advertising and promotional campaign with annual sales increasing from 2.5 million barrels in 1975 to six million barrels in 1977.

As part of its advertising campaign to promote LITE beer, Miller has used four television commercials: John Mackey-Matt Snell, football Superbowl heroes; Mendy Rudolph-Tom Heinsohn, former National Basketball Association ("NBA") referee and coach; Deacon Jones, former National Football League lineman and member of the "fearsome foursome"; and the VanArsdale twins, former NBA basketball players. Miller characterizes these commercials as "unique" and "attention-getting". The setting of each of the four commercials is a tavern. In Mackey-Snell, the two are seen arm wrestling while Mackey addresses the camera and informs the audience that LITE is less filling, has one-third fewer calories than Miller's regular beer, and "really tastes great." Both then recite in unison that "in fact, after I teach this guy a lesson, I'm going to have another bottle." The camera immediately focuses on a close-up of the familiar triumvirate of bottle, can and filled foamy-headed glass of beer, a groan is heard signaling the end of the arm wrestling duel, and an announcer's voice reads the words emblazoned across the screen: "LITE beer from Miller. Everything you always wanted in a beer. (Pause) And less." In Rudolph-Heinsohn, after Heinsohn notes their frequent basketball game disagreements over the years, he ac-knowledges that they finally agree on something—LITE beer from Miller. Nevertheless, they quickly digress into an argument over which of LITE's attributes—less filling or great taste—is better. The tension mounts culminating in the former referee blowing his whistle and ejecting the NBA coach from the tavern. The announcer again tells the audience that LITE is everything a beer drinker wants. In the third commercial, Deacon Jones strolls menacingly through a bar as the crowd parts in his path and then poetically relates LITE's beneficial characteristics ending with a threat to break a nose if he is not believed. The same concluding format is utilized with the announcer's voice heard as the camera focuses on the trio of bottle, can and frosty beer glass. Finally, the advertisement with the VanArsdale twins employs the advertising technique of having two identical twins recite the commercial's message in unison. However, a disagreement soon arises over whether LITE has a third less calories or great taste resulting in utter confusion between them as to each's identity. Again, the familiar announcer's voice is heard reinforcing the words displayed across the screen. Miller has registered its claim to copyright in each of these four commercials by filing certificates of copyright registration (Reg. Nos. PA 250, PA 251, PA 252 and PA 253) with the United States Copyright Office. In addition, Miller is the owner, *inter alia,* of the following trademarks registered on the principal register in the United States Patent and Trademark Office: HIGH LIFE (Reg. No. 305,854), HIGH LIFE in design (Reg. No. 614,062), LITE (Reg. No. 929,277), and LITE design (Reg. No. 905,236).

Carling has for many years engaged in the business of brewing, marketing and selling alcoholic beverages, including beer and ale, primarily in the Dominion of Canada, but also through subsidiaries in the United States. In February 1978 Carling commenced selling a reduced calorie beer in Canada under the trademark HIGHLITE.[3]

---

3. Since June 1967, Carling's brewery in Newfoundland had been selling a light beer under the brand name "Haig".

In the development of such light beer, Carling requested its advertising agency, the Caledon Advertising Company, Ltd., of Toronto ("Caledon") to submit proposed brand names. Of the names submitted, Carling at first preferred SUPERLITE; however, the Canadian Consumer and Corporate Affairs Department refused to grant approval on the ground that SUPERLITE would have a tendency to mislead consumers into thinking that the beer was a very light beer or had a very low alcoholic content. Thereafter, Carling decided to use the name HIGHLITE allegedly to convey the message to consumers that its new light beer was of special interest or significance. At the present time, Carling does not sell HIGHLITE in the United States and it is sold in only four Canadian provinces. In order to promote sales of its low calorie beer, Carling has and is utilizing, *inter alia,* the following three television commercials: the arm wrestle, the delivery man, and the McCluskey brothers. These commercials were developed and produced on behalf of Carling by Caledon. Each of Carling's said commercials is set in a tavern. In the first commercial, two unidentified men are seen engaged in arm wrestling while one tells the other that HIGHLITE is brewed like regular beer. He in turn responds that he drinks HIGHLITE because it tastes less filling. The statements are repeated three times. In the interim, the camera focuses on two bottles of HIGHLITE and a third man sits down between the arm wrestlers. He points out to them that they both drink HIGHLITE because it tastes great and has fewer than seventy calories per bottle. The arm wrestlers agree and cease their arguments momentarily, but lapse immediately into a disagreement over who will buy the next round of beer. A close-up follows showing a HIGHLITE bottle next to a filled glass of beer and an announcer's voice exclaims that HIGHLITE is "a new light beer for all kinds of reasons." In the delivery man commercial, a gregarious fellows joins his friends at a table in a tavern and states "Not snow nor sleet nor dead of night will keep me from the friends I like. Each has a reason for him that's right to

drink this new light beer, HIGHLITE." His group of friends responds "All right." The supposed delivery man after pouring a glass of HIGHLITE continues: "You know I like this new HIGHLITE. Tastes good cause it's brewed like regular beer and has a little less than seventy calories a bottle. But what I also like is this. Although it tastes like it takes less space, still new HIGHLITE. delivers taste." This brings forth a roar from the crowd. The familiar announcer's voice is then heard over a close-up of a HIGHLITE bottle and foamy glass of beer. In the McCluskey brothers, the three brothers are standing arm-in-arm. Joe McCluskey, the oldest, tells us he drinks HIGHLITE, "a light beer that tastes good cause it's brewed like regular beer." John, the second oldest, also drinks HIGHLITE but because it has "a little less" than seventy calories per bottle and tastes less filling. The third brother, Jim, although the youngest, is the biggest and he drinks whatever he wants to drink. Jim then lifts the other two brothers off the ground by the back of their shirts and the same ending as shown in the former Carling commercials follows. In none of the three commercials is Carling's name used or mentioned.

Carling has expended in excess of $500,000 for the creation, production and telecast of its HIGHLITE commercials and has contracted to spend an additional two million dollars from April 1, 1978 through March 31, 1979. The production costs for the three commercials exceeded $100,000. Under Canadian provincial laws, Carling is permitted to advertise its HIGHLITE beer only in Ontario and British Columbia. Carling's prospective buyers were informed by its sales representatives that the introduction of HIGHLITE in the market place would be supported with a substantial advertising and promotional campaign, including newspaper, magazine and television advertisements. As part of its television campaign, Carling decided to use television stations in Buffalo to broadcast HIGHLITE because such transmissions are received by television viewers in Ontario either directly or through cable television systems and be-

cause of cost efficiency—such stations reach a larger audience than Canadian stations. Carling entered into a contract, which expired March 31, 1978, with Taft for the broadcast of its HIGHLITE commercials over WGR–TV in Buffalo.

Beginning in May of 1971, Carling has sponsored wrist wrestling (a derivative of arm wrestling) tournaments held each year in Timmins, Ontario, Canada. Initially these tournaments were called "The Carling Canadian World Wrist Wrestling Championship," but in 1972 the title was changed to "Carling World Wrist Wrestling Championship." In addition, an arm wrestling television commercial was developed for Carling in 1965 by its former advertising agency, Young & Rubicam, for use in a promotional campaign for Carlings's Brading[4] ale featuring the slogan "Are you big enough for a Brading?" This commercial, first broadcast in 1966, features two big burly men arm wrestling in a hotel in Massachusetts in 1875. At the end of the match, the participants saunter over to the bar for a Brading ale.

At oral argument on the instant motion, Miller's four LITE commercials and Carling's three HIGHLITE commercials and its Brading ale arm wrestling commercial were screened by means of a movie projector for my edification.

■■ Although addressed to the sound discretion of the district court judge, a motion for a preliminary injunction, inherently an award of extraordinary relief, cannot be granted unless the moving party clearly shows the threat of irreparable harm and either probable success on the merits or a balance of hardships tipping decidedly in its favor and sufficiently serious litigable questions going to the merits. *Wainwright Sec. v. Wall Street Transcript Corp.,* 558 F.2d 91, 94 (2d Cir. 1977); *State of New York v. Nuclear Reg. Com'n,* 550 F.2d 745 (2d Cir. 1977); *Triebwasser, etc., Katz v. American Tel. & Tel. Co.,* 535 F.2d 1356 (2d Cir. 1976); *Sonesta Int'l Hotels Corp. v. Wellington Associates,* 483 F.2d 247 (2d Cir. 1973). In

an action alleging infringement of copyrighted matter or of a trademark, as in all cases, the *sine qua non* for the issuance of a preliminary injunction is the requisite showing by the movant of possible irreparable harm prior to trial on the merits. *Charlie's Girls, Inc. v. Revlon, Inc.,* 483 F.2d 953 (2d Cir. 1973); *I.H.T. Corp. v. Saffir Pub. Corp.,* 444 F.Supp. 185 (S.D.N.Y.1978); *Blazon, Inc. v. DeLuxe Game Corp.,* 268 F.Supp. 416 (S.D.N.Y.1965).

■ However, a detailed showing of the danger of irreparable harm is not required in a copyright infringement action where the copyright holder establishes a prima facie case of infringement. *Uneeda Doll Co. v. Goldfarb Novelty Co.,* 373 F.2d 851, 852 (fn.1) (2d Cir. 1967); *Joshua Meier Co. v. Albany Novelty Co.,* 236 F.2d 144, 147 (2d Cir. 1956); *Rushton v. Vitale,* 218 F.2d 434, 436 (2d Cir. 1955); *Houghton Mifflin Co. v. Stackpole Sons, Inc.,* 104 F.2d 306 (2d Cir.), *cert. denied,* 308 U.S. 597, 60 S.Ct. 131, 84 L.Ed. 499 (1939). Furthermore, in the usual copyright infringement case a presumption may be raised that irreparable harm will befall the copyright holder upon the infringement of its exclusive use of the copyrighted matter. *Robert Stigwood Group Ltd. v. Sperber,* 457 F.2d 50, 55 (2d Cir. 1972); *Concord Fabrics, Inc. v. Marcus Bros. Textile Corp.,* 409 F.2d 1315, 1317 (2d Cir. 1969); *American Metropolitan Ent. of N.Y. v. Warner Bros. Records,* 389 F.2d 903, 905 (2d Cir. 1968). Similarly, the infringement of one's trademark usually in and of itself gives rise to the distinct possibility of irreparable injury. *Taylor Wine Co. v. Bully Hill Vineyards, Inc.,* 569 F.2d 731, 733 (fn.1) (2d Cir. 1978); *P. Daussa Corp. v. Sutton Cosmetics (P.R.) Inc.,* 462 F.2d 134, 136 (2d Cir. 1972). When a trademark is infringed, the owner's business reputation and good will are placed in jeopardy due to his inability to exercise any control over the nature and quality of goods being sold or advertised under the infringing trademark. *Standard Brands v. Smidler,* 151 F.2d 34, 37 (2d Cir. 1945); *S. C. Johnson & Son v. Johnson,* 116 F.2d 427 (2d Cir. 1940); *Yale*

---

4. Brading is a registered trademark of Carling.

*Electric Corp. v. Robertson,* 26 F.2d 972 (2d Cir. 1928). In addition it is usually difficult, if not impossible, for the trademark owner to muster sufficient proof of the precise measure of its damages or to show how much of any provable injury can be solely attributed to the infringement. *Pure Foods v. Minute Maid Corp.,* 214 F.2d 792, 797 (5th Cir. 1954); *Carling Brewing Company v. Philip Morris, Inc.,* 277 F.Supp. 326, 335–36 (N.D.Ga.1967). Irreparable injury is suffered where monetary damages cannot be calculated with a reasonable degree of certainty or will not adequately compensate the injured party. *Danielson v. Local 275, Laborers Int. U. of No. Amer.,* 479 F.2d 1033, 1037 (2d Cir. 1973). In the instant case irreparable harm would result to Miller's reputation and good will if HIGHLITE is an inferior product and the public attributes such to Miller or if consumers are misled into thinking that Miller's HIGH LIFE beer is a reduced calorie brand and are disappointed when they discover it is a regular beer. Carling's commercials do not tell the television audience that HIGHLITE is brewed by Carling or that it is not sold in the United States. Therefore, Miller has met its burden of showing the threat of irreparable injury *pendente lite* to its reputation and good will and the difficulty of ascertaining damages with reasonable certainty if its copyrights and trademarks have in fact been infringed. *See, Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc.,* 428 F.2d 379 (2d Cir. 1970); *Safeway Stores, Inc. v. Safeway Properties, Inc.,* 307 F.2d 495 (2d Cir. 1962).

In a copyright infringement action, a plaintiff must prove ownership of a valid copyright and copying by the defendant. *Novelty Textile Mills v. Joan Fabrics Corp.,* 558 F.2d 1090 (2d Cir. 1977); *R. Dakin & Co. v. A & L Novelty Co., Inc.,* 444 F.Supp. 1080 (E.D.N.Y.1978); *McGraw-Hill, Inc. v. Worth Publishers, Inc.,* 335 F.Supp. 415, 419 (S.D.N.Y.1971). On the instant motion, Miller has submitted certified copies of its certificates of copyright registration for each of its four LITE television commercials. Pursuant to 17 U.S.C. § 410(c), said certificates "constitute prima facie evidence of the validity of the copyright[s] and of the facts stated in the certificate[s]." This statutory language has generally been construed to mean prima facie proof of ownership and validity. *Novelty Textile Mills v. Joan Fabrics Corp., supra,* at 1092 (fn.1). In addition, Carling has controverted neither the validity of those copyrights nor Miller's ownership of them. Therefore, for purposes of the instant motion Miller has shown that it is the owner of a valid copyright for each of its LITE commercials.

Because direct evidence of copying is rarely, if ever, available, copying is usually proved by circumstantial evidence of access to the copyrighted work and substantial similarities as to protectible material in the copyrighted and defendant's works. *Reyher v. Children's Television Workshop,* 533 F.2d 87, 90 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976); *Arnstein v. Porter,* 154 F.2d 464 (2d Cir. 1946); *see also, Sid & Marty Krofft Television v. McDonald's Corp.,* 562 F.2d 1157 (9th Cir. 1977). The test for access is whether or not defendant had a reasonable opportunity to view or copy. *Musto v. Meyer,* 434 F.Supp. 32 (S.D. N.Y.1977); *Arrow Novelty Co., Inc. v. Enco National Corp.,* 393 F.Supp. 157 (S.D.N.Y. 1974); *Blazon, Inc. v. DeLuxe Game Corp., supra; but, see, Bradbury v. Columbia Broadcasting System, Inc.,* 287 F.2d 478, 479 (9th Cir. 1961). In the instant case, Miller's LITE commercials were widely broadcast throughout the United States, and television viewers in Toronto as well as other Canadian cities and areas were and are able to receive and watch American television broadcasts either directly or through cable television systems. Therefore, Carling had access to—i. e., a reasonable opportunity to view or copy—Miller's LITE commercials. *See, Detective Comics, Inc. v. Bruns Publications,* 28 F.Supp. 399 (S.D.N.Y.1939), *modified on other grounds,* 111 F.2d 432 (2d Cir. 1940). The statements by Robert Gorman, Senior Copywriter at Caledon, in his affidavit that he "do[es] not recall" and "cannot recall ever having seen" the Mackey-Snell,

Heinsohn-Rudolph, and VanArsdale twins LITE commercials prior to working on Carling's HIGHLITE commercials or those by Colin Merriam, Caledon's Associate Creative Director, in his affidavit that he "do[es] not know any of [Miller's LITE] commercials" or that he has "not seen any American television in [his] home in over two years as the rabbit ears on [his] set do not give [him] good enough reception" do not negate Carling's access to Miller's commercials. First, Gorman admitted later in his affidavit that he had seen Miller's Deacon Jones commercial in March or April of 1977 prior to Caledon commencing work on the HIGHLITE commercials in October of 1977. Second, David J. Lewis, Carling's Vice President for Marketing, conceded in his affidavit that he had seen all four of Miller's LITE commercials prior to the development of the HIGHLITE television commercials.

As in most copyright infringement actions, Miller's success on the merits or in establishing a probability thereof will turn upon the existence *vel non* of substantial similarities between Carling's and its television commercials. The standard to be applied to the factual question of substantial similarity is whether or not an ordinary lay observer would recognize the allegedly infringing work as an appropriation of the copyrighted work. *Novelty Textile Mills v. Joan Fabrics Corp., supra; Concord Fabrics, Inc. v. Marcus Brothers Textile Corp., supra; Ideal Toy Corporation v. Fab-Lu Ltd. (Inc.),* 360 F.2d 1021 (2d Cir. 1966). In *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir. 1960), the Honorable Learned Hand remarked that "[t]he test for infringement of a copyright is of necessity vague." In analyzing the number, degree and kind of similarities between Miller's and Carling's commercials it must be remembered that the protection afforded by a copyright does not encompass ideas but only extends to the particular expressions of those ideas. *Mazer v. Stein,* 347 U.S. 201, 217, 74 S.Ct. 460, 98 L.Ed. 630 (1954); *Baker v. Seldon,* 101 U.S. 99, 102–03, 25 L.Ed. 841 (1879); *Reyher v. Children's Television Workshop, supra.* It has

often been emphasized that "no one infringes, unless he descends so far into what is concrete [in a work] as to invade * * * [its] 'expression.'" *National Comics Publications v. Fawcett Publications,* 191 F.2d 594, 600 (2d Cir. 1951).

In addition, a copyright does not protect the holder from another's use of general themes or plots, but rather the gist of copyright infringement is the pirating of particular expressions of thematic concepts by use of similar details, scenes, events and characterization. *Shipman v. RKO Pictures,* 100 F.2d 533, 538 (2d Cir. 1938); *Sheldon v. Metro-Goldwyn Pictures Corporation,* 81 F.2d 49, 54 (2d Cir.), *cert. denied,* 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936); *Midas Productions, Inc. v. Baer,* 437 F.Supp. 1388 (C.D.Cal.1977). This does not mean that similarities of expressions which naturally flow from the attempt to convey a common idea or theme are actionable. Copyright protection does not extend to the sequence or pattern of scenes or events which necessarily must follow from the handling of similar plot situations. *Reyher v. Children's Television Workshop, supra.*

It is also settled that duplication of every detail or exact reproduction is not necessary to establish infringement. *Comptone Co. v. Rayex Corp.,* 251 F.2d 487 (2d Cir. 1958); *Nikanov v. Simon & Schuster, Inc.,* 246 F.2d 501, 504 (2d Cir. 1957); *see, also, Runge v. Lee,* 441 F.2d 579, 582 (9th Cir. 1971); *Universal Pictures Co., Inc. v. Harold Lloyd Corporation,* 162 F.2d 354, 360 (9th Cir. 1947). Paraphrasing will not save the infringer. *Henry Holt & Co. v. Liggett & Myers Tobacco Co.,* 23 F.Supp. 302 (E.D. Pa.1938). Nor are trivial or minor changes of any moment. *College Entrance Book Co. v. Amsco Book Co.,* 119 F.2d 874, 876 (2d Cir. 1941). An infringement of a copyright can be found where only a small portion of a work is copied so long as the part usurped is material and substantial. *Associated Music Pub. v. Debs Memorial Radio Fund,* 141 F.2d 852 (2d Cir. 1944); *Henry Holt & Co. v. Liggett & Myers Tobacco Co., supra.* The protective umbrella of a copyright

**440**

"cannot be limited literally to the text, else a plagiarist would escape by immaterial variations." *Nichols v. Universal Pictures Corporation,* 45 F.2d 119, 121 (2d Cir. 1930). Thus, insignificant or slight variations between the commercials in question cannot be relied upon by Carling to escape the reach of Miller's copyrights.

Miller correctly points out that in one of Carling's HIGHLITE commercials two men arm wrestle in a tavern (as was the situation in its Mackey-Snell commercial) and argue over which of HIGHLITE's merits is paramount (as was depicted in its Heinsohn-Rudolph commercial), that in Carling's delivery man commercial poetry is recited to convey the sales pitch (as in Miller's Deacon Jones advertisement), and that in Carling's McCluskey Brothers advertisement, the three speak in unison ending the scenario with an unusual twist (as the Van-Arsdales had done in their commercial). Miller defines the idea or theme of each of its LITE commercials and of each of Carling's HIGHLITE commercials as the sales message communicated by them: that reduced calorie beer is desirable to drink because it tastes great and is less filling. Miller concedes, as it must, that this is not subject to copyright protection. However, Miller vigorously asserts that arm wrestling, an argument as to which attribute of a light beer is most important, the recitation of a sales message in verse, and brothers speaking in unison are the expressions used to communicate the commercials' idea and hence protected by its copyrights. In addition, Miller submits that a comparison of its and Carling's commercials readily reveals that each's setting, characterization, format, language, pace and pattern of scenes are substantially similar with only immaterial variations. It should be noted that Miller does not contend that the entirety of Carling's three HIGHLITE commercials was lifted from its own and has conceded that portions of the HIGHLITE commercials are original. On the other hand, Carling opposes Miller's narrow definition of its commercials' idea or theme as being merely that light beer is desirable because it is great tasting and less filling. Carling

submits that the idea or theme of Miller's LITE commercials is the use of famous personalities in rather absurd situations arguing and reciting verse about light beer, and that the expressions of each commercial "are the actual words used by the characters and the characters themselves (famous athletes)." Carling forcefully argues that Miller's attempt to extend the coverage of its copyrights to arm wrestling, argument in a tavern, recitation of verse and brothers speaking in unison by defining these advertising devices as "expressions" of the sales message would virtually foreclose the use of these commonplace and unoriginal advertising techniques in beer commercials and "borders on the outrageous." Finally, Carling asserts that its HIGHLITE commercials are not otherwise substantially similar to Miller's LITE advertisements.

█ For purposes of the instant motion, I find that arm wrestling, argument in a tavern, recitation of poetry, and siblings speaking in unison used in Miller's and Carling's light beer commercials are only ideas or themes therein and do not constitute expressions subject to copyright protection. The use of arm wrestling in Miller's Mackey-Snell commercial does not express the theme that LITE is less filling and still tastes great. It is merely used as a vehicle for placing characters in context. Admittedly, arm wrestling could be used as an advertising technique to portray a masculine and rugged tavern atmosphere, but such is merely a thematic concept in Miller's commercial. In addition, Miller cannot claim originality in the use of arm wrestling in beer commercials. Arm wrestling was a theme exploited by Carling in its Brading ale commercial in 1966. The argument in a tavern, in and of itself, does not amount to the expression of an idea in Miller's Heinsohn-Rudolph commercial. In such advertisement, it is the words voiced by the antagonists which convey the idea of LITE having great taste and fewer calories, and not the argument *per se.* In addition, friendly arguments in a tavern over the merits of a beer have been a familiar scene in numerous commercials and other produc-

tions throughout the years. Similarly, the use of verse in Miller's Deacon Jones commercial is not by itself expression, but merely a manner of formulating words to express an idea. The words spoken by the central character are the expression of the idea Miller wants to be conveyed and the fact that certain words rhyme or flow at a repetitive cadence does not make the elocution itself a protectible expression. The infringement of Miller's verse would arise from substantial similarities appearing in the poetry recited by Carling's delivery man and not by the mere fact that he chose to relate his tale in poetic form. In addition, the use of verse in connection with the promotion of a product is hardly original. For example, the sales message in advertisements for Wrigley's Doublemint chewing gum that appeared on television as early as 1960 was conveyed in verse, as was that of Campbell Soup some 45 years ago. Finally, Miller's utilization of identical twins speaking in unison is not protectible expression, but rather merely an advertising theme. The words spoken by the Van-Arsdales express the idea. Nothing is added to that expression by both speaking simultaneously. In addition, the use of identical twins, such as in a long-running series of Wrigley's Doublemint commercials, or the use of non-identical siblings in the advertising of a product, is commonplace. Nevertheless, Miller contends that its depiction of arm wrestling, argument, verse and speaking in unison should be protected because it "[took] these elements and place[d] them in the context of beer advertising, set in a tavern." To accept this assertion would result in the patently unacceptable result that no other brewer could utilize any of these advertising techniques in future television commercials. The copyright laws were not meant to be construed in such a broad fashion.

Furthermore, a comparison of the two sets of commercials leads me to conclude at this time that they are not otherwise substantially similar. The language, scenes, characters and details of the HIGHLITE commercials, although similar, do not encroach upon the protected expression of the LITE advertisements. Of course, similarity to a certain degree is to be expected. Miller and Carling are competitors selling basically the same product—light beer—and both wish to convey to the consuming public its complementary attributes of great taste and low calorie content. Moreover, a thirty-second commercial leaves little room for factual and thematic development whereby a competitor can place distinguishing features therein to avoid infringing another's previously-produced work promoting a similar product.[5]

Miller's reliance upon *Bradbury v. Columbia Broadcasting Systems, Inc., supra* (the novel *Fahrenheit 451* held infringed by the teleplay "A Sound of Different Drummers"), and *Sheldon v. Metro-Goldwyn Pictures Corporation, supra* (the play "Dishonored Lady" held infringed by the movie "Letty Lynton"), is misplaced. Those cases are factually inapposite to the one at hand. Although in both cases considerable differences in plot, relationship of characters and dialogue existed, there were myriad parallel incidents, episodes and scenes too numerous and similar to be coincidental. Recognizing that the brevity of the commercials here in question forecloses for all practical purposes the laundry list of parallelisms noted in *Bradbury* and *Sheldon,* nevertheless I fail to perceive upon viewing and comparing such commercials any massive and wholesale usurpation. "Where similarities or identities are relied upon, they must do more than engender a suspicion of piracy; they must establish piracy with reasonable certainty." *Wilkie v. Santly Bros.,* 91 F.2d 978, 979 (2d Cir.), *cert. denied,* 302 U.S. 735, 58 S.Ct. 120, 82 L.Ed. 568 (1937). Miller has not established substantial similarity between its LITE commercials and Carling's HIGHLITE commercials. Therefore, Miller has failed to meet its burden of showing a probability of success on the merits of its copyright infringement cause of action.

---

5. Of course, the short duration of television commercials also limits the number of points of similarity.

Carling contends that this court lacks jurisdiction over Miller's trademark infringement and unfair competition causes of action because HIGHLITE beer is not marketed and sold in the United States.[6] Carling's contention is not well taken. Under section 32(1)(a) of the Lanham Act, as amended, 15 U.S.C. § 1114(1)(a), a trademark infringer is defined as:

"Any person who shall, without the consent of the registrant—

(a) use *in commerce* any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; * * * ". (Emphasis added.)

On its face, such statutory provision requires for jurisdictional purposes that the infringing trademark be used in commerce; there is no requirement that the product itself be used in commerce.[7] In the instant case, Carling's mark HIGHLITE has been used in its television commercials aired in Buffalo. The Lanham Act, as amended, defines "commerce" broadly to mean "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. It is undeniable that Congress has the power to and does regulate television broadcasting primarily through the Federal Communications Commission. Therefore, I find that this court has jurisdiction over Miller's trademark infringement cause of action. Such having been established, this court also has jurisdiction over Miller's unfair competition claim under principles of pendent jurisdiction.

Carling's citation of *Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633 (2d Cir. 1956), in support of its assertion of lack of jurisdiction is to no avail. Therein, it was held that the remedies provided by 15 U.S.C. §§ 1114 *et seq.* should not be given an extraterritorial application against foreign citizens acting in a foreign country under a presumably valid trademark registration in that country. *Id.*, at 643. The court found distinguishable an earlier decision, *Steele v. Bulova Watch Co.*, 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952), which had held that the federal courts had jurisdiction to prevent the use of an infringing trademark by a United States citizen in a foreign country. The reasoning in such case was premised upon the fact that the defendant therein was a United States citizen and that the United States has broad powers to regulate the conduct of its citizens in foreign countries. In *Vanity Fair Mills,* the allegedly infringing acts were committed by a foreign citizen in his home country. Neither of these cases lends any support to Carling's argument of jurisdictional insufficiency. In the instant case, Miller does not seek any extraterritorial application of the Lanham Act, as amended.

In addition, Carling, in its attempt to show that jurisdiction is lacking over Miller's trademark infringement cause of action, has misinterpreted that portion of 15 U.S.C. § 1127 which provides:

"For purposes of this chapter a mark shall be deemed to be used in commerce (a) *on goods* when it is placed in any manner on the goods or their containers or the displays associated thereto and the goods are sold or transported in commerce * * * ". (Emphasis added.)

Such provision spells out the jurisdictional requirements necessary where a party alleges infringement as to a mark placed *on goods* and seeks relief pertaining to the sales of those goods. For jurisdiction to lie over the goods bearing the mark, they must

---

6. Carling conceded at oral argument that by causing its HIGHLITE commercials to be televised in Buffalo long-arm jurisdiction exists as to said commercials, but adamantly disputed personal jurisdiction over HIGHLITE labels appearing on its product sold in Canada. As to the latter point, Miller does not contend that this court has jurisdiction over the sales of products bearing the HIGHLITE label in Canada.

7. Miller correctly pointed out that under 15 U.S.C. § 1125, which provision is not here pertinent, use of goods in commerce is a jurisdictional prerequisite. *See, Blazon, Inc. v. DeLuxe Game Corp., supra* at 428.

have been sold or transported in interstate commerce (either within the United States or between the United States and a foreign country) or, if in intrastate or entirely foreign commerce, there must have been a substantial effect on interstate commerce. *Drop Dead Co. v. S. C. Johnson & Son, Inc.*, 326 F.2d 87, 93–94 (9th Cir. 1963); *Stauffer v. Exley*, 184 F.2d 962, 966 (9th Cir. 1950). However, in the instant case, Miller does not allege infringement by Carling's use of its trademark HIGHLITE on its product nor does it contend that this court has jurisdiction over the sales of goods bearing the HIGHLITE mark in Canada, but asserts only that the use of the mark HIGHLITE in Carling's television commercials shown in Buffalo falls within the jurisdictional ambit of the Lanham Act, as amended. As stated above, the use of an infringing mark in interstate commerce—i. e., the televised commercials—alone bestows jurisdiction on this court (15 U.S.C. § 1114(1)(a)) and there is no additional prerequisite that goods bearing the allegedly infringing trademark have been sold or transported in interstate commerce before jurisdiction is established over Miller's claims of trademark infringement and unfair competition.

To establish its trademark infringement cause of action, Miller must show that it has the right to the exclusive use of a trademark and infringement by Carling. *Maternally Yours v. Your Maternity Shop*, 234 F.2d 538 (2d Cir. 1956). Miller alleges that Carling's trademark HIGHLITE, which is displayed in its television commercials, infringes both its HIGH LIFE and LITE marks.[8] In *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75 (7th Cir. 1977), *reversing* 427 F.Supp. 1192 (W.D. Wis.1977), *cert. denied*, 434 U.S. 1025, 98

S.Ct. 751, 54 L.Ed.2d 772 (1978), the court reversed the issuance of a preliminary injunction and held that the word "light", including its phonetic equivalent "lite", was a generic or common descriptive term as applied to beer and thus could not be exclusively appropriated by Miller as a trademark for beer. In an unreported decision, *Miller Brewing Company v. Olympia Brewing Company*, No. C77–65T (W.D.Wash. Feb. 27, 1978), the court in denying Miller's motion for a preliminary injunction similarly concluded that the term "light" and its phonetic equivalent "lite" are generic or common descriptive terms in the brewing industry not subject to trademark protection. In addition, the court in *Miller Brewing Company v. Jos. Schlitz Brewing Co.*, 449 F.Supp. 852 (E.D.Wis.1978), granted defendant's motion for partial summary judgment relying upon the finding in *Heileman* that "light" including its misspelled version "lite" are generic or common descriptive terms not susceptible to copyright protection. In addition to dismissing those counts predicated upon Miller's ownership of the trademark LITE, the court pursuant to 15 U.S.C. § 1119 ordered the Commissioner of Patents and Trademarks to cancel Miller's registrations of its LITE trademark.[9] In view of these precedents, Miller has not shown, and probably cannot show, that it has the right to the exclusive use of the term "lite" as applied to a reduced calorie beer. Therefore, Miller has failed to meet its burden of showing that it will probably succeed at trial on the merits in establishing that HIGHLITE infringes its erstwhile trademark LITE.

On the other hand, Carling does not dispute the validity of Miller's trademark

---

8. Miller also alleges that the close resemblance between Carling's HIGHLITE label, also displayed in its commercials, and Miller's LITE label constitutes unfair competition. Miller's LITE label employs a red "bull's-eye" design imprinted with gold sheafs of grain, the name LITE in blue letters with the lower member of the letter "L" extending beneath the letter "i", and gold trim against a white background, while Carling's HIGHLITE label uses a red bull's-eye engrafted with leaves of gold and three circular gold emblems, the name HIGH-

LITE printed across the bull's eye in white letters on a blue background with the lower member of the letter "L" extending beneath the letter "i", and gold trim against a white background. It is unnecessary to reach this unfair competition claim on the instant motion.

9. It should also be noted that Miller had conceded the propriety of such cancellation if the court determined that "light" was a generic or common descriptive term.

HIGH LIFE or its exclusive right to use such mark in connection with the sale, promotion, advertising or labeling of beer.[10] Furthermore, Miller's trademark HIGH LIFE appears to be incontestable under section 1065 of Title 15 of the United States Code and section 1115(b) in pertinent part provides that the registration of a trademark which has become incontestable "shall be conclusive evidence of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods * * * specified in the [section 1065] affidavit * * *." Therefore, for purposes of the instant motion, Miller has established the right to the exclusive use of its HIGH LIFE trademark.[11]

▇ Carling's contention that the trademark HIGH LIFE is not ordinarily used in the marketplace separate and apart from the name Miller—i. e., that Miller's premium beer is known and referred to as Miller HIGH LIFE and not simply as HIGH LIFE—although perhaps true does not negate Miller's right to the exclusive use of its mark HIGH LIFE and to protect it from being infringed.[12] To accept Carling's contention would mean that any defendant could escape the reach of the trademark laws by simply inserting a brand name in front of the allegedly infringed mark and claiming that such differentiates or distinguishes the marks regardless of the similarity between or even identity of the two marks without inclusion of the brand name. For all practical purposes the trademark laws under such interpretation would afford little or no protection to the trademark owner. Carling's contention that its mark

HIGHLITE should only be compared to Miller HIGH LIFE and not to simply the registered mark HIGH LIFE is therefore rejected. *See, Miles Shoes v. R. H. Macy & Co.*, 199 F.2d 602, 603 (2d Cir. 1952).

▇ · A party infringes another's trademark when his use of a mark in connection with the sale, offering for sale, distribution or advertising of any goods is likely to cause confusion, or to cause mistake, or to deceive. 15 U.S.C. § 1114(1)(a). Thus, "[c]onfusion * * * is * * * the keystone of an action based upon infringement of a registered mark." *Avon Shoe Co. v. David Crystal, Inc.*, 279 F.2d 607, 612 (2d Cir.), *cert. denied*, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960). The test is whether or not there is a likelihood that an appreciable number of ordinarily prudent purchasers would be confused as to the source of goods which they are purchasing or in distinguishing one product from another. *Avon Shoe Co. v. David Crystal, Inc., supra*, at 612; *Maternally Yours v. Your Maternity Shop, supra*, at 542; *Syntex Laboratories, Inc. v. Norwich Pharmacal Co.*, 315 F.Supp. 45, 49 (S.D.N.Y.1970), *aff'd*, 437 F.2d 566 (2d Cir. 1971); *Corning Glass Works v. Jeannette Glass Company*, 308 F.Supp. 1321, 1325 (S.D.N.Y.), *aff'd per curiam*, 432 F.2d 784 (2d Cir. 1970). It is not essential to show actual confusion or deception in order to establish trademark infringement. *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755, 761 (2d Cir. 1960); *Maternally Yours v. Your Maternity Shop, supra*, at 542; *Corning Glass Works v. Jeannette Glass Company, supra*, at 1327. In assessing the likelihood

---

**10.** Pursuant to 15 U.S.C. § 1057(b), Miller's certificates of registration for its marks HIGH LIFE and HIGH LIFE in design constitute "prima facie evidence of the validity of the registration[s], registrant's ownership of the mark[s], and of registrant's exclusive right to use the mark[s] in commerce in connection with the goods * * * specified in the certificate * * *."

**11.** There are four categories of terms with respect to trademark protection: (1) generic, (2) descriptive, (3) suggestive and (4) arbitrary or fanciful. *See, Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.

1976). On the instant motion, Carling did not contend that Miller's trademark HIGH LIFE is other than arbitrary or fanciful as applied to beer and hence entitled to trademark protection.

**12.** The fact that Miller's beer may be referred to as Miller or Miller HIGH LIFE and not simply HIGH LIFE may be considered as a factor in assessing the likelihood of confusion with Carling's mark HIGHLITE. *See McGregor-Doniger, Inc. v. Drizzle, Inc.*, 446 F.Supp. 160, 163 (S.D.N.Y.1978); *Carling Brewing Company v. Philip Morris, Inc., supra*, at 330.

of confusion to the buying public, the court should consider and weigh the following factors: the degree of similarity between the marks in appearance, pronunciation and suggestion; the proximity in use and manner of marketing the products; the strength of plaintiff's mark; the degree of care likely to be exercised by and the sophistication of affected consumers; any evidence of actual confusion by purchasers; and defendant's subjective intent—i. e., his good faith or lack thereof—in adopting its mark. *Maternally Yours v. Your Maternity Shop, supra,* at 543; *Polaroid Corporation v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *Syntex Laboratories, Inc. v. Norwich Pharmacal Co., supra,* at 49; *National Automobile Club v. National Auto Club, Inc.,* 365 F.Supp. 879, 882 (S.D.N.Y.1973), *aff'd,* 502 F.2d 1162 (2d Cir. 1974). "These factors are variable and relative and no single one, because of its presence or absence, is, in itself, determinative of a case." *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.,* 411 F.2d 1097, 1099 (2d Cir. 1969), *cert. denied,* 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970); *see, also, Triumph Hosiery Mills, Inc. v. Triumph International Corp.,* 308 F.2d 196, 200 (2d Cir. 1962).

The general purpose of the trademark laws is to prevent one party from palming off his goods as those of another. *American Foundries v. Robertson,* 269 U.S. 372, 380, 46 S.Ct. 160, 70 L.Ed. 317 (1926). Moreover, it has long been recognized that one endeavoring to break into a market and rival a competitor already there has a duty to select a trademark which is sufficiently distinct to avoid all possible likelihood of the buying public confusing its product with that of its competitor. *G. D. Searle & Co. v. Chas. Pfizer & Co., Inc.,* 265 F.2d 385, 387 (7th Cir.), *cert. denied,* 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed.2d 65 (1959); *Florence Mfg. Co. v. J. C. Dowd & Co.,* 178 F. 73, 75 (2d Cir. 1910). In *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., supra,* at 758, the Second Circuit Court of Appeals succinctly said:

"It is permissible in the American competitive economy for the second comer to endeavor to capture as much of the first comer's market as he can. He must do this, however, by giving his product a name and dress descriptive and fanciful in its own right and selling it on its own merit, not by confusing the public into mistakenly purchasing his product for his competitor's. The second comer must create a reputation of its own and not trade on the goodwill of another product already established at considerable cost and risk."

In evaluating the similarity in appearance and pronunciation between two marks, each case must be considered on its own facts and therefore citation of precedents does not provide a definitive answer to such factual inquiry. *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., supra,* at 757. Although not conclusive, a review of prior cases does reveal, in a general fashion, the benchmark by which similarities have been judged. *LaTouraine Coffee Co. v. Lorraine Coffee Co.,* 157 F.2d 115, 117 (2d Cir.), *cert. denied,* 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663 (1946). *Compare, Communications Satellite Corp. v. Comcet, Inc.,* 429 F.2d 1245 (4th Cir. 1970) ("Comsat" infringed by "Comcet"); *Syntex Laboratories, Inc. v. Norwich Pharmacal Co., supra* ("Vagitrol" infringed by "Vagestrol"); *David Sherman Corp. v. Heublein, Inc.,* 340 F.2d 377 (8th Cir. 1965) ("Smirnoff" infringed by "Sarnoff"); *Harold F. Ritchie, Inc. v. Chesebrough-Pond's Inc., supra* ("Brylcreem" infringed by "Valcream"); *G. D. Searle & Co. v. Chas. Pfizer & Co., supra* ("Dramamine" infringed by "Bonamine"); *Q-Tips, Inc. v. Johnson & Johnson,* 206 F.2d 144 (3d Cir.), *cert. denied,* 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953) ("Q-Tips" infringed by "Cotton Tips"); *Miles Shoes, Inc. v. R. H. Macy & Co., supra* ("Gro Shoe" infringed by "Gropals"); *Telechron, Inc. v. Telicon Corp.,* 198 F.2d 903 (3d Cir. 1952) ("Telechron" infringed by "Telicon"); *LaTouraine Coffee Co. v. Lorraine Coffee Co., supra* ("LaTouraine" infringed by "Lorraine"); *McKesson & Robbins, Inc. v. American Foundation for Dental Science,* 150 F.2d 420 (Cust. & Pat.

App.1945) ("Dent-A-Min" not entitled to registration because likely to be confused with previously registered mark "Cytamin"); *George W. Luft Co. v. Zande Cosmetic Co.*, 142 F.2d 536 (2d Cir.), *cert. denied*, 323 U.S. 756, 65 S.Ct. 90, 89 L.Ed. 606 (1944) ("Tangee" infringed by "Zande"); *William S. Merrill Co. v. Anacin Co.*, 109 F.2d 339 (C.C.P.A.1940) ("Alycin" denied registration due to prior use of mark "Anacin"); *Brown-Forman Distillery Co. v. Arthur M. Bloch L. I.*, 99 F.2d 708 (7th Cir. 1938) ("Old Forester" infringed by "Old Foster"); *Industrial Rayon Corp. v. Dutchess Underwear Corp.*, 92 F.2d 33 (2d Cir.), *cert. denied*, 303 U.S. 640, 58 S.Ct. 610, 82 L.Ed. 1100 (1937) ("Spun-lo "infringed by "Sunglo"); *Bookman v. Oakland Chemical Co.*, 17 C.C.P.A. 1213, 40 F.2d 1006 (1930) ("Peroxogen" denied registration because confusingly similar to mark "Dioxogen"); *Western Oil Refining Co. v. Jones*, 27 F.2d 205 (6th Cir. 1928) ("Silver Flash" infringed by "Super-Flash"); *Northam Warren Corp. v. Universal Cosmetic Co.*, 18 F.2d 774 (7th Cir. 1927) ("Cutex" infringed by "Cuticlean"); *National Biscuit Co. v. J. B. Carr Biscuit Co.*, 55 U.S.App.D.C. 146, 3 F.2d 87 (1924) ("Eta" denied registration because of likelihood of confusion with "Uneeda"); *Gehl v. Hebe Co.*, 276 F. 271 (7th Cir. 1921) ("Hebe" infringed by "Meje"); *Florence Mfg. Co. v. J. C. Dowd & Co., supra* (defendant's use of "Sta-Kleen" constituted unfair competition with plaintiff's product marketed under name "Keepclean"); *Dubonnet Wine Corp. v. Atlas Import & Export Corp.*, 51 F.Supp. 73 (S.D.N.Y.1943) ("Dubonnet" infringed by "Debonair"); *Kraft Cheese Co. v. Leston Co.*, 43 F.Supp. 782 (E.D.Mo.1941) ("Miracle Whip" infringed by "Salad Whip") *with, Upjohn Company v. Schwartz*, 246 F.2d 254 (2d Cir. 1957) ("Syrocol" did not infringe "Cheracol"); *Kinsington Steel Co. v. Nichols Engineering & R. Corp.*, 38 C.C.P.A. 979, 188 F.2d 397 (1951) ("Nucalloy" granted registration as not being confusingly similar to trademark "Oroloy"); *Synchromatic Corporation v. Eureka Williams Corp.*, 174 F.2d 649 (7th Cir. 1949) ("Oil-O-Matic" not infringed by

"Synchromatic"); *Pennzoil Co. v. Crown Central Petroleum Corp.*, 140 F.2d 387 (4th Cir. 1944) ("Pennzoil" not infringed by "Greenzoil"); *McGregor-Doniger, Inc. v. Drizzle, Inc., supra* ("Drizzle" did not infringe "Drizzler"). The United States Supreme Court has observed that "[w]hat degree of resemblance is necessary to constitute an infringement is incapable of exact definition * * *." *McLean v. Fleming*, 96 U.S. 245, 251, 24 L.Ed. 828 (1877). Furthermore, it must be remembered that a high degree of similarity between or even identity of marks is not sufficient by itself to constitute infringement; a court must balance and weigh all pertinent factors to determine the likelihood of confusion. *King Research, Inc. v. Shulton, Inc.*, 454 F.2d 66 (2d Cir. 1972).

In the instant case, there is a striking similarity between HIGH LIFE and HIGHLITE in appearance and pronunciation.[13] Where, as here, the products are closely related or identical in use, strong visual and phonetic resemblance in marks is a significant factor to be considered in gauging likelihood of confusion. *Syntex Laboratories, Inc. v. Norwich Pharmacal Co., supra*. In the instant case involving similar alcoholic beverages, "the degree of similarity in the marks necessary to support a finding of infringement is less than in the case of dissimilar * * * products." *A. Smith Bowman Distillery, Inc. v. Schenley Distillers, Inc.*, 198 F.Supp. 822, 826 (D.Del. 1961). Carling contends in its memorandum of law that "there are sufficient visual and sound distinctions to avoid a likelihood of confusion." The only distinctions between HIGH LIFE and HIGHLITE in appearance are that the former is comprised of two single-syllable words while the latter consists of one two-syllable word and that in the second part (word or syllable) of each the third letter is different—"f" rather than "t"—forming a different word or syllable—"life" instead of "lite". However, " * * * this form of technical gymnastics is not determinative". *LaTouraine Cof-*

---

**13.** Miller admitted that the two marks have different suggestive connotations.

fee Co. v. Lorraine Coffee Co., supra at 117. In addition, the sound of the two marks when spoken is as close as could be while yet retaining a distinction. Because of the extreme similarity in pronunciation, there well could be misunderstandings when the two products are mentioned or referred to orally in the marketplace by the public. Carling contends that such confusion is not likely to arise because Miller's beer is not referred to as simply HIGH LIFE. Even if true, such is not dispositive. Rather, an inquiry must be made into whether or not the mark HIGH LIFE has come to be associated in the minds of a significant segment of the public with Miller. It has been authoritatively set forth that to establish such mental identification the plaintiff "must show that the primary significance of the term in the minds of the consuming public is not the product but the producer." *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938). Being a strong mark which has been heavily advertised for many years, it is very likely that HIGH LIFE is readily identified by an appreciable number of beer drinkers with Miller.

There is a close relationship in the use and manner of marketing Miller's HIGH LIFE and Carling's HIGHLITE. Both are beers and consumed for refreshment. In any common market areas, they will be found by consumers in close proximity to each other on store shelves. They are promoted in the same manner by means of television and radio commercials and newspaper and magazine advertisements. In the instant case, the only means used to date for advertising HIGHLITE in the United States has been television commercials, but other avenues are available to Carling. Miller's HIGH LIFE has been extensively promoted, *inter alia,* through televised commercials. The fact that HIGHLITE is not yet sold in the United States

thereby foreclosing direct product competition here at the present time is of little significance.[14] Carling is free to enter the United States market and sell its HIGHLITE beer here. Moreover, marketplace competition between HIGH LIFE and HIGHLITE is not necessary so long as confusion as to the source of these presently non-competing products is likely to arise in the public's mind upon viewing the HIGHLITE commercials. *Fleischmann Distilling Corp. v. Maier Brewing Company,* 314 F.2d 149, 159 (9th Cir. 1963); *Safeway Stores, Inc. v. Safeway Properties, Inc., supra,* at 499; *Triangle Publications v. Rohrlich,* 167 F.2d 969, 972 (2d Cir. 1948); *Yale Electric Corporation v. Robertson, supra,* at 974. In addition, although Miller's HIGH LIFE beer is not sold anywhere in Canada but in the province of Alberta, the protection afforded by the trademark laws includes Miller's "legitimate potential to expand to other markets." *National Automobile Club v. National Auto Club, Inc., supra,* at 882; *see, also, Federal Telephone & R. Corp. v. Federal Television Corp.,* 180 F.2d 250 (2d Cir. 1950).

With respect to the strength of Miller's HIGH LIFE mark, as previously noted, Carling does not contend that HIGH LIFE is other than arbitrary or fanciful as applied to beer. A term which is used in an arbitrary fashion is considered to be a "strong" mark and is accorded a greater degree of trademark protection than a "weak" one. *Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* at 9; *J.B. Williams Co., Inc. v. LeConte Cosmetics, Inc.,* 523 F.2d 187, 192 (9th Cir. 1975), *cert. denied,* 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1976). For purposes of ruling on the instant motion, I find that Miller's mark HIGH LIFE is a "strong" mark entitled to a high degree of trademark protection.

14. Although Miller's HIGH LIFE is a regular beer and Carling's HIGHLITE is a reduced calorie beer, there is in general cross-competition between these types of beer. The record does not specify the four Canadian provinces in which HIGHLITE is presently marketed and sold. Miller's HIGH LIFE brand is now not sold anywhere in Canada but in the province of Alberta. Consequently, whether cross-competition between these products exists in Alberta cannot be determined on the present record.

The degree of care likely to be exercised by the public in purchasing beer is, comparatively, on the lower end of the spectrum. Beer is a relatively inexpensive commodity consuming only a small portion of total disposable income. Consumers are not likely to give the purchase of a bottle, glass or case of beer the careful thought and consideration devoted to the acquisition of a more expensive item of greater importance, such as an automobile, household furnishings and appliances, or clothing. Carling's assertions in its memorandum of law that light beers are usually segregated from the regular brands on a retailer's shelves and that the average beer drinker would easily distinguish regular from reduced calorie beer are unavailing. A side-by-side test is particularly inappropriate where, as here, inexpensive goods are involved. *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., supra,* at 762 (fn.19). In addition, there are likely to be a considerable number of inattentive beer purchasers due to its low monetary value. The courts have repeatedly emphasized that "[c]onfusion on the part of the careless or inattentive purchaser may not be disregarded." *Id.,* at 761.

Due to the recent marketing of Carling's HIGHLITE and the mutually exclusive geographic distributions (except for the above-noted uncertainty concerning the Province of Alberta) of HIGHLITE and Miller's HIGH LIFE, no evidence of actual confusion in the marketplace has been adduced. However, the test for trademark infringement is likelihood of confusion and not actual confusion.

Finally, an examination of Carling's good faith or lack thereof in selecting its mark HIGHLITE must be undertaken. At this stage of the litigation, evidence of intent or conscious imitation can only be gleaned from the pleadings and affidavits in the record. In marketing its light beer, Carling selected the name HIGHLITE which is undeniably very similar to Miller's successful regular beer HIGH LIFE. Evidence of intent is not limited solely to a comparison of the degree of similarity between Miller's mark HIGH LIFE and Carling's HIGHLITE, but may properly include all the circumstances surrounding the development and naming of Carling's HIGHLITE. Subsequent to Miller's considerable success in promoting its LITE beer throughout the United States, Carling is attempting to establish and develop the potential market for light beer in Canada. Although I found with regard to the allegations of copyright infringement that the similarities between Miller's and Carling's commercials involved either ideas or were otherwise not substantial, it nevertheless remains true that they are indeed similar. The HIGHLITE commercials use each of the themes utilized in the LITE commercials—arm wrestling, argument, verse and speaking in unison. It is significant that Carling's name is not mentioned or referred to in any of its HIGHLITE commercials. In addition, the HIGHLITE label resembles to a fair degree Miller's LITE label. Both employ a similar color scheme, a red bull's-eye graphic design, and an extension of the lower member of the letter "L" under the letter "i" in the word LITE. Based upon this evidence, an inference of conscious imitation of Miller's trademark can readily be drawn. The fact that HIGHLITE is not sold in the United States and that Carling had originally selected the name SUPERLITE for its light beer before picking HIGHLITE does not show that Carling did not intend to imitate. Carling had a duty to stay far enough away from Miller's established trademark to avoid all likelihood of confusion as to the source of its product. Carling did not do so.

In view of the foregoing, Miller has established the probability of success on the merits of its trademark infringement cause of action. Having so determined, it becomes unnecessary to decide the probability of Miller's succeeding on its claim that the similarities between its and Carling's labels constitutes unfair competition.

Balancing the hardships, the scales tip decidedly in Miller's favor. Between 1973 and 1977, Miller has expended over seventy-eight million dollars in advertising and promoting its HIGH LIFE beer. Furthermore,

Miller is seeking to protect its reputation and good will for its most successful product in its principal market, the United States. In 1977, sales of Miller's HIGH LIFE beer reached fifteen million barrels. On the other hand, Carling has expended $500,000 to create and telecast its HIGHLITE commercials and has entered into contracts to expend an additional two million dollars for further promotional endeavors. However, at the present time, Carling does not sell HIGHLITE in the United States and the relief sought herein by Miller is limited to television commercials aired in the United States. Carling may continue to sell and advertise HIGHLITE in its sole market, Canada. Any injunction entered by this court would merely prevent Carling from causing its commercials to be broadcast in the United States where its HIGHLITE beer is not yet sold.

It is therefore thereby

ORDERED that Carling is enjoined *pendente lite* from broadcasting or causing to be broadcast in the United States any television commercial advertising its HIGHLITE beer.