**Rosella H. WERLIN, Plaintiff,**

v.

**The READER'S DIGEST ASSOCIATION, INC., Defendant.**

**No. 80 Civ. 5152 (RJW).**

United States District Court, S. D. New York.

Dec. 9, 1981.

Zissu & Harris, New York City, Esqs., for plaintiff; Michael Zissu, New York City, of counsel.

Warshavsky, Hoffman & Cohen, New York City, Esqs., for defendant; David W. Cohen, Ava K. Doppelt and David Otis Fuller, Jr., New York City, of counsel.

## DECISION OF THE COURT

ROBERT J. WARD, District Judge.

This action is maintained under the Copyrights Act, 17 U.S.C. Sections 101–810, and principles of common law. Plaintiff is Rosella H. Werlin ("Werlin"). The sole remaining defendant is The Reader's Digest Association, Inc. ("RDA"). Werlin seeks a judgment against defendant whereby she would be afforded certain monetary and injunctive relief. Her action is based on three distinct legal claims: (1) Copyright

infringement within the meaning of 17 U.S.C. Section 501(a); (2) Misappropriation within the meaning of New York tort law; and (3) Unjust enrichment within the meaning of New York contract law. The jurisdiction of the Court to hear this action is founded on 28 U.S.C. Section 1338(a), 28 U.S.C. Section 1338(b), and principles of pendent jurisdiction.

The Court, having heard the testimony adduced during the trial, having examined the exhibits received in evidence, having reviewed its contemporaneous trial notes, which include the Court's appraisal of the witnesses and their demeanor, having drawn reasonable inferences from this evidence, and having evaluated the pertinent legal principles, makes, upon the totality of the testimony and the documentary evidence, the following findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.

### Background

Rosella H. Werlin is a citizen and resident of Texas. She has worked as a journalist for over fifty years. During this time she has written hundreds of articles that have been published in various newspapers and magazines throughout the United States. She has also worked, on either a full-time or a part-time basis, for a number of newspapers and magazines over the course of her career.

Defendant RDA is a corporation organized under the laws of the State of Delaware, and has its principal place of business in Pleasantville, New York. RDA is engaged in the publishing business. Among its publications is a monthly magazine called *Reader's Digest.*

In early 1978, Werlin completed an article entitled "Rina: A Child Whose Problems Changed Many Lives." The article, which the Court will presently summarize in some detail, concerned the Bas Mitzvah ceremony of a child, Rina Cahana, who was afflicted with Down's Syndrome. This ceremony, which Werlin attended, occurred on February 18, 1977. Shortly thereafter, Werlin began to do research for her article. However, she did not begin to write it until the end of 1977, and did not complete her manuscript until the beginning of 1978. Having completed the article, Werlin then sent copies of her manuscript to a number of newspapers and magazines, asking that they consider the piece for publication. The publications to which she sent the article included the *Dallas News, Houston's Legal Advocate,* the *Houston Post,* and the *Texas Monthly.* In approximately June 1978, Werlin's piece was accepted for publication by *Houston's Legal Advocate.* This publication is a monthly newspaper published in Houston, Texas. It is directed towards the Houston legal community and is distributed free of charge to the approximately five thousand persons on the newspaper's mailing list.

Plaintiff's article ultimately appeared in the September 1978 issue of *Houston's Legal Advocate.* Werlin's article, as it appeared in *Houston's Legal Advocate,* is approximately 2500 words long. The bulk of the article describes the Bas Mitzvah ceremony of Rina Cahana, a thirteen-year-old girl afflicted with Down's Syndrome. It states that Rina Cahana's life-long goal was to have a Bas Mitzvah, details the roles played by her father (a rabbi) and her mother (a survivor of the Nazi concentration camps) in the achievement of that goal, and explains the physical and mental hurdles that Rina Cahana had to overcome to achieve her goal. According to the article, the Bas Mitzvah was attended by over five hundred people; among these were many family friends, a number of similarly afflicted children and their parents, certain of Rina Cahana's physicians, teachers, counsellors, and physical therapists, as well as a great many interested persons among the community at large, including several nuns and priests. Notwithstanding the foregoing, Werlin testified at trial that only one priest attended the Bas Mitzvah, and that altogether only 150 people were there.

The article quotes at length from a composition prepared for the occasion by Rina Cahana, and from a sermon given by Rabbi Cahana. Parents of other children afflicted

with Down's Syndrome are quoted as well regarding their reactions to the ceremony. Generally, these parents stated that the Bas Mitzvah, which the article characterizes as "a triumph for Rina Cahana," had made them more hopeful with respect to the futures of their own children.

After briefly detailing the activities of a local organization, known as "Parents of Down's Syndrome Children," in dealing with the problems of bringing up children afflicted with Down's Syndrome, the article turns to a general discussion of the disease. It explains when the disease was first identified, how it manifests itself in those who are afflicted with it, what theories are currently espoused regarding the causes of the disease, and how afflicted children are normally cared for. The article concludes by theorizing as to how many children in the United States suffer from Down's Syndrome, concluding that as many as thirty thousand persons may be afflicted.

In November 1978, shortly after its publication in *Houston's Legal Advocate*, Werlin sent a copy of her article to RDA. RDA receives numerous unsolicited articles from authors. Such articles fall in two broad categories. One category consists of articles that have already appeared in another publication. Such articles are known at RDA as "pick-up pieces." The second category includes original manuscripts, that is, articles that have never been published before. Such pieces are of two varieties: some are what RDA calls "first-person" articles, which are articles recounting a particular event in the author's life; the others, known in RDA parlance as "original pieces," are articles such as customarily might be written by professional freelance authors.

In the event an unsolicited article such as the Court has just described is accepted by RDA for publication in *Reader's Digest*, RDA has a rather complicated scale for determining the compensation to be paid to the author of the article. In 1978, when Werlin submitted her article on Rina Cahana to RDA, authors of "pick-up pieces" received $450 for each page that the article occupied in *Reader's Digest*. RDA also would pay the publication in which the article originally appeared a fee of $450 per page. This general payment scheme did not pertain, however, in the event the reprinted article had originally appeared in a publication with which RDA had a contract governing reprint rights. In this event, RDA would pay the publication the contractually arranged fee. It would be up to the publication to decide whether the author would be paid any compensation. In 1978, RDA had such contracts with a number of major publications; however, RDA has never had such a contract with *Houston's Legal Advocate*. Compensation for other unsolicited articles that RDA selected for publication was made as follows in 1978. The fee for "first-person" articles was then $3500. The fee for "original" articles ranged from $2600 to $3000, depending on the experience of the author. First-time authors generally were paid $2600.

Occasionally, RDA receives unsolicited "first-person" articles or "original" articles that are not suitable for publication in their present form. RDA will often ask the author of such a piece to rewrite it, either on speculation or on condition that, if RDA ultimately determines not to use the piece, the author will be paid a "kill fee." In 1978, the "kill fee" was $500.

Authors also frequently submit story ideas to RDA. In the event RDA determines that the idea could be developed into a publishable piece, RDA will either ask the person who sent in the idea to prepare a draft or give the topic to one of its staff writers. In the latter event, the individual who submitted the idea is paid a "spotter's fee." In 1978, the amount of a "spotter's fee" was $250.

Occasionally, the editors at RDA will determine, upon reviewing a potential "pick-up piece," that, although the piece itself is not suitable to be reprinted in *Reader's Digest*, the topic of the article is a viable topic for a *Reader's Digest* article. In such event, RDA assigns one of its own writers to prepare a new article on the topic. Upon publication of the newly prepared article,

RDA typically pays the author of the original article a "spotter's fee" for suggesting the topic. As noted, in 1978 the amount of a "spotter's fee" was $250.

Before turning to the circumstances surrounding Werlin's submission of her article concerning Rina Cahana to RDA, it is necessary for the Court to discuss, in some detail, Werlin's relationship with RDA. Werlin's original contact with RDA occurred in 1970, when she communicated with RDA to determine whether it might be interested in a piece she was planning to write on Golda Meir, then Prime Minister of Israel. Mary T. Sieyn, a department editor at RDA, responded to her request by a brief letter in which she stated that RDA was not interested in the article. Sieyn concluded her letter by commenting, "Should you go ahead with your piece and place it elsewhere, however, I would be interested in seeing tearsheets of the published version." In 1971, Werlin submitted a previously published article to RDA for consideration. This article was rejected by RDA in a letter written by Helene B. Given, an associate editor at RDA.

In 1972, after her first submission to RDA had been rejected, Werlin attended the Southwest Writers Conference in Houston. There, Werlin met John H. Allen, then employed by RDA as an assistant managing editor. Allen attended the conference on behalf of RDA and gave a speech to the audience. He has given many such speeches during his career at RDA. Allen testified that, on occasions such as the Southwest Writers Conference, he normally spoke from a prepared text. In his speeches, Allen would concentrate on explaining the types of articles in which RDA was interested and on encouraging authors to send RDA, on speculation, their original manuscripts, their ideas for articles, and their previously published pieces.

In encouraging authors in this fashion, Allen was following what amounts to a de facto RDA policy that unknown writers are to be encouraged to write and to submit what they write to RDA for consideration. This policy is rooted partly in a somewhat altruistic notion that writers are good people who perform an important social function that ought to be encouraged, but more fundamentally in the plain fact that RDA substantially depends on outside authors to generate articles, and topics for articles, for inclusion in *Reader's Digest.*

In his speeches at writers conferences, Allen also would typically inform the audience of RDA's pay scale for "first person" articles, "original" articles, and "pick-up" articles that were accepted for publication. He did not customarily tell the audience that under certain circumstances a person who submitted either an article or an idea to RDA might be paid either a "kill fee" or a "spotter's fee."

Allen's speech at the Southwest Writers Conference basically followed his typical pattern. He informed the audience, which included Werlin, of the subject areas that made good articles, he encouraged authors to send published and unpublished articles, as well as ideas for articles, to RDA on speculation, and he outlined the then-effective RDA pay scale for pieces that were accepted for publication. He did not mention that, were an author to send a previously published article to RDA, RDA might determine not to reprint it, but to use the author's topic as the basis for an independently prepared article, in which event the author would receive a "spotter's fee."

Upon meeting Werlin at the conference, and learning that she had previously submitted an article to RDA that had been rejected, Allen encouraged Werlin to continue to submit both published and unpublished articles to RDA. He told her that, while he could give her no assurance that any of her articles would be published, each article that she submitted would be read by RDA's editorial staff. Allen further stated that, in the event Werlin submitted an original article to RDA that was not publishable in its current form, but had the makings of a useable piece, RDA would be willing to help her rewrite the article in order to bring it into publishable form. However, Allen did not tell Werlin that, in the event she submitted a previously published piece to

RDA, RDA might determine not to reprint the article but to use the topic of the article as the basis for a newly prepared piece, in which event Werlin would be paid a "spotter's fee" of $250.

Werlin was encouraged by Allen's speech and her later conversation with Allen, and thus continued to send both published and unpublished articles to RDA to be considered for publication in *Reader's Digest.* She also submitted several ideas for articles. Werlin customarily mailed any article or idea for an article that she wanted RDA to consider directly to Allen. All of the articles that Werlin sent to Allen in the years 1973–1976 were rejected by RDA. Customarily, they were returned to Werlin together with a note from Allen explaining the reasons why the article could not be published in *Reader's Digest.*

None of Werlin's articles were, according to these notes, rejected because they were poorly written. Indeed, Allen described one as a "good job," a second as "informative," a third as a "good job," and a fourth as a "darn good job." On another occasion, Allen commented that Werlin was "doing well." In 1973, Allen wrote to Werlin as follows: "Should you—from time to time— have any other published material you feel might suit our audience, I'll always be glad to look over copies on speculation." Allen reiterated this statement later in 1973, and never, either in the course of his correspondence with Werlin or during a meeting that he had with Werlin at RDA's offices in 1974, told Werlin that she should discontinue submitting either articles or ideas to RDA. Rather, his correspondence to and conversations with Werlin throughout this period can only be fairly characterized as encouraging her to continue to make such submissions. Werlin interpreted Allen's intentions in this fashion and accordingly continued to submit articles and ideas to RDA, notwithstanding the fact that none had ever been accepted.

While Allen consistently encouraged Werlin to make submissions to RDA, he had, in fact, developed by 1973 or 1974 a very negative attitude regarding her ability to produce an article that would be useable by RDA. He presently is of the opinion that Werlin is not capable of producing an article that RDA can publish. Allen nonetheless continued to encourage Werlin, partly because he liked her and did not want to offend her, and partly because he retained some hope that RDA might one day get something useable out of her submissions.

By the time Werlin wrote her article on Rina Cahana, Allen had, as Werlin knew, been transferred to a non-editorial position at RDA. Thinking that Allen thus might not be in a position to consider her article, Werlin sent her article to Allen's attention, but also addressed it "To Whom It May Concern."

The article was received by RDA in November 1978. Because Allen was no longer working as an editor, Werlin's article was routed to RDA's editorial correspondence department, which exists to deal with unsolicited manuscripts that are not directed to any particular RDA editor. Werlin's article was initially read by Elinor Griffith, an editor employed by RDA in the editorial correspondence department. She prepared a memorandum on the article for Robert F. Rigby, then a senior editor at RDA. In this memorandum, Griffith stated her view that Werlin's article, while it contained "the kernel of a darn good story," was too poorly written to be published in *Reader's Digest.* However, since she liked the idea of an article based on what she termed "Rina Cahana's Triumph," she suggested that Werlin's article be given to one of RDA's writers, with a view toward preparing an original piece on the subject.

Griffith then sent Werlin's article, together with a memorandum expressing her views on the piece, to Rigby. Rigby also liked the idea of an article on Rina Cahana. He thought, however, that it would be "impossible to get a useable piece" from Werlin, and accordingly agreed with Griffith's suggestion that Werlin's article be given to one of RDA's own writers so that an entirely new piece could be prepared.

Next, Griffith sent Werlin's article, together with her memorandum and Rigby's comments, to Peter Canning, an assistant managing editor at RDA. Canning thought Werlin's article disclosed a "viable" article topic. In December 1978, Canning met with Joseph P. Blank, who was employed by RDA as a staff writer, and who then had the title of "roving editor," regarding several proposed article topics, including the topic suggested by Werlin's article. Since Blank had previously written articles on retarded individuals for *Reader's Digest* and another magazine, Canning thought Blank might be interested in this topic.

At the meeting with Blank, Canning gave him a copy of Werlin's article and Griffith's memorandum. While RDA occasionally uses potential "pick-up pieces" such as Werlin's for article topics, Blank had never received a topic in this fashion. Blank, after reading these materials, decided that he would like to write an article about Rina Cahana. He notified Canning of this in a handwritten memorandum. Canning then referred the proposed topic to RDA's editorial assignment committee, which was chaired by Edward T. Thompson, the editor-in-chief of RDA. This committee approved the topic and formally assigned Blank to write the article.

Blank thereupon commenced preparation of the article. He began by asking RDA's research department to locate background material on Down's Syndrome, which material he read during the spring of 1979. In May 1979, Blank called Rina Cahana's mother, Alice Cahana, to determine whether the Cahana family would be willing to cooperate with RDA regarding his article. Alice Cahana and her husband, Rabbi Moshe Cahana, ultimately entered into an agreement with RDA whereby RDA agreed to pay the Cahanas $1000 for permission to publish an article in *Reader's Digest* on Rina Cahana.

Blank then traveled to Houston to research the article. He was in Houston for a period of eight consecutive days in June 1979. While there, he interviewed all the members of the Cahana family, friends of the family, and one of Rina's teachers. Most of these interviews were taped. Blank also spent a good deal of time with Rina Cahana, went to Austin, Texas, to watch her participate in a swim meet, and attended a picnic with the Cahana family.

RDA did not initiate any communication with Werlin regarding Blank's article, nor did it ever reject Werlin's article as it had her previous submissions. Werlin first learned that RDA intended to do an article on Rina Cahana during a conversation with Alice Cahana in May 1979. Alice Cahana told Werlin that RDA had contacted her about the article and that Blank had been assigned to write it.

Werlin immediately telephoned Blank in New York. Blank told Werlin that he was not going to rewrite her piece but was planning to write an entirely new article. In the course of subsequent correspondence and conversations during May and June of 1979 between Werlin and Blank, Werlin offered to cooperate with Blank on the article and demanded that she receive a by-line on any article prepared by Blank. Blank refused either to accept Werlin's offer or to accede to Werlin's demand. He did, however, offer her $250 for "spotting" the idea for the article. Werlin did not accept this offer. Instead, she wrote letters of complaint to Canning, Blank's editor, and Allen.

In the latter half of 1979, Blank prepared a draft of an article on Rina Cahana. Each of the facts disclosed in Blank's article was verified by him through his independent research when he traveled to Houston. He did not rely on Werlin's article as the basis for any of his factual assertions. Blank's draft was edited by RDA's staff, and prepared for publication. In the course of this preparation, Indie Miller Ahl, an editorial research associate at RDA, verified each of the factual statements made in Blank's article by finding at least two sources to confirm each fact. In undertaking this verification process, Ahl did not use Werlin's article in any fashion.

When Blank's article was ready to be published, RDA sent the Cahanas a check in the amount of $1000, pursuant to the agree-

ment discussed previously. Blank and Canning decided between themselves, without any further negotiation or discussion with Werlin, that Werlin should be paid the "spotter's fee" that Blank had previously offered. Accordingly, RDA mailed Werlin a check in the amount of $250. Werlin never cashed the check. Blank, who receives a salary in his position as a roving editor at RDA, earned an additional fee of $3550 for the article. This represented Blank's standard contractual fee for an article of this length.

Blank's article, as it appeared in *Reader's Digest*, is approximately 2200 words long. It is entitled "The Triumph of Rina Cahana." The article basically is the story of Rina Cahana's life, beginning with her birth in 1963, and climaxing with her Bas Mitzvah in February 1977. The article explains the physical and mental hurdles that Rina Cahana faced on account of her affliction, details the role played by her family in helping her deal with that affliction, and recounts several incidents from her youth that illustrate the difficulties that Rina Cahana faced, and the strength with which she and her family faced them.

Approximately one-third of Blank's article is devoted to Rina Cahana's Bas Mitzvah. According to the article, the Bas Mitzvah was attended by over 500 people; among these people were many family friends, a number of parents of similarly afflicted children, and interested people among the community at large, including several nuns and priests. The article quotes from a composition prepared for the occasion by Rina Cahana and from a sermon given by Rabbi Cahana. Parents of other children afflicted with Down's Syndrome are quoted as well regarding their reactions to the ceremony. Generally, these parents stated that the Bas Mitzvah had made them hopeful with respect to the futures of their own children. The article concludes with a short box briefly stating some of the methods that are used to treat children afflicted with Down's Syndrome, and identifying two national associations that are dedicated to helping retarded persons.

## The Instant Action

Werlin commenced this action by filing a complaint in this Court on September 10, 1980. The original complaint named Blank and RDA as defendants, and apparently relied on the theory that Blank's preparation and RDA's publication of the Blank article constituted an infringement of Werlin's common-law copyright in her article. On June 9, 1981, Werlin filed a motion, pursuant to Rule 15, Fed.R.Civ.P., for leave to serve and file an amended complaint. Defendants opposed this motion and cross-moved pursuant to Rule 12(b)(6), Fed.R.Civ.P., for an order dismissing the complaint. In an oral decision rendered on July 8, 1981, this Court granted Werlin's motion for leave to serve and file an amended complaint, and denied defendants' cross-motion to dismiss.

The amended complaint names the same defendants and states two claims. The first alleges that RDA and Blank, by preparing and publishing the Blank article, infringed Werlin's federal copyright in her article in violation of 17 U.S.C. Section 501(a). The second alleges that RDA and Blank, by employing the idea for an article disclosed by Werlin's article, misappropriated that idea in violation of New York tort law.

The parties then filed cross-motions for summary judgment. In deciding the summary judgment motions, this Court focused almost entirely on the federal copyright claim. The Court, while it frankly stated that it was disposed to find in defendants' favor on the federal copyright claim because it did not find the requisite "substantial similarity" between the two articles, *see Warner Bros. v. American Broadcasting Cos.*, 654 F.2d 204, 207 (2d Cir. 1981), denied both motions for summary judgment. The Court's decision was based in large part on the decision of the Court of Appeals for this Circuit in *Arnstein v. Porter*, 154 F.2d 464 (2d Cir. 1946). In that case, the Court of Appeals emphasized that, since the question whether two literary works are substantially similar is a question of fact, *see Miller Brewing Co. v. Carling O'Keefe Breweries*,

*Ltd.*, 452 F.Supp. 429, 439 (W.D.N.Y.1978), summary judgment should only rarely be granted in copyright cases, even where, as here, the case will be tried to the court and not to a jury. *Arnstein v. Porter, supra*, 154 F.2d at 474–75. In light of *Arnstein v. Porter*, which the Court of Appeals continues to cite with approval, *see, e.g., Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir.), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980), the Court determined that the best course was to try this case, notwithstanding the fact that other members of this Court have expressed the view that *Arnstein v. Porter* should no longer be read as broadly as it once was, *see, e.g., Musto v. Meyer*, 434 F.Supp. 32, 36 (S.D.N.Y.1977), *aff'd mem.*, 598 F.2d 609 (2d Cir. 1979), and also notwithstanding the Court's own feeling that substantial similarity, since it is determined by an objective test that merely requires the trier of fact to compare the two pieces in question, *Decorative Aides Corp. v. Staple Sewing Aides Corp.*, 497 F.Supp. 154, 157 (S.D.N.Y.1980), *aff'd mem.*, 657 F.2d 262 (2d Cir. 1981), is capable of being determined on a motion for summary judgment in a case where the judge is to be the trier of fact. Accordingly, in an oral decision rendered October 23, 1981, the Court denied the cross-motions for summary judgment and scheduled the case for trial beginning on November 4, 1981.

At the request of the parties, the trial date of this case was adjourned several times. The trial ultimately began on December 7, 1981. At the close of the plaintiff's case, plaintiff moved, pursuant to Rule 15(b), Fed.R.Civ.P., for leave to further amend her complaint in order that the pleadings would conform to the evidence. This motion was prompted by plaintiff's desire to rely on a third legal theory as a basis for defendants' alleged liability. Specifically, Werlin wished to assert a quasi-contract claim based on the theory that defendants were unjustly enriched by having used and benefitted from the story idea disclosed by Werlin's article. The Court, on the basis of defendants' counsel's representation that he did not feel that defendants would be prejudiced by such an amendment

as long as the Court would decide the case on the basis of the record before it, and on the basis of plaintiff's counsel's statement that he would be willing to rely on the record before the Court, determined to grant plaintiff's motion. The Court stated that it would deem the amended complaint to have been further amended to assert a quasi-contract claim.

During the trial, plaintiff moved to dismiss this action insofar as it was maintained against defendant Blank. Defendant Blank did not oppose the motion. Accordingly, the Court dismissed this action against defendant Blank with prejudice but without costs.

Having described at some length the factual setting of this action, and having introduced Werlin's three claims, the Court now turns to a discussion of the legal merit of each of those claims. With respect to each claim, the Court first outlines the relevant legal principles and then proceeds to apply those principles to the facts of the case.

### Federal Copyright Claim

In order to make out a claim for copyright infringement under 17 U.S.C. Section 501(a), a plaintiff must show: (1) ownership of a valid copyright; and (2) copying by the defendant. *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 (2d Cir. 1977); *Kamakazi Music Corp. v. Robbins Music Corp.*, 522 F.Supp. 125, 134 (S.D. N.Y.1981).

The Court finds that the first prong of this test has been satisfied here, notwithstanding the fact that Werlin's article was published in *Houston's Legal Advocate* without any copyright notice attached. The copyright protection that her article enjoys is determined by the Copyrights Act, Pub.L. No. 94–553, 90 Stat. 2541 (1976), codified in 17 U.S.C. Sections 101–810. *See* 17 U.S.C. Section 301(a). Werlin's article, having been completed in early 1978, automatically received copyright protection on the date of its completion. *Id.* Section 302(a). Whenever a work that enjoys copyright protection is published in the United

States by authority of the copyright owner, a notice of copyright must be placed on all publicly distributed copies. *Id.* Section 401(a). While failure to affix such a notice will generally invalidate an author's copyright in a work, this result does not occur if (1) the work was registered either before or within five years after the work was published without notice; and (2) a reasonable effort was made to affix the requisite notice to all copies of the work that were distributed to the public after the omission was discovered. *Id.* Section 405(a)(2).

■ Here, then, while it is true that Werlin's article was published, under Werlin's authority, by *Houston's Legal Advocate* with no copyright notice affixed, Werlin's copyright protection in her article was not thereby invalidated. She obtained a copyright registration for her article that became effective on November 11, 1980, thus satisfying the first prong of Section 405(a)(2). Since no copies of her work were distributed to the general public after the omission was discovered in *Houston's Legal Advocate*, the second prong of Section 405(a)(2) has also been satisfied. Under these circumstances, the Court holds that the copyright protection enjoyed by Werlin's article was not invalidated by publication of that article in *Houston's Legal Advocate* without any copyright notice having been affixed. Accordingly, the Court concludes that Werlin has shown ownership of a valid copyright.

■ The Court thus turns to the second part of the test for copyright infringement under 17 U.S.C. Section 501(a), namely, the question whether Werlin has shown that defendant copied her article. Because direct evidence of copying is ordinarily unavailable, the courts have consistently permitted copyright plaintiffs to make the requisite showing of copying through indirect, or circumstantial, proof. Generally, copying will be inferred where a plaintiff establishes (1) that the defendant had access to the copyrighted work; and (2) that the two works are substantially similar. *Warner Bros. v. American Broadcasting Cos., supra,* 654 F.2d at 207.

Here, both defendant RDA and Blank had access to Werlin's article. RDA stipulated that it received Werlin's article in November 1978, and Blank testified that he was given a copy of Werlin's article in December 1978. Upon being given the article, Blank read it. The significant question for the Court, then, is whether the Werlin article and the Blank article are substantially similar.

■ "[T]he determination of the extent of similarity which will constitute a *substantial* and hence infringing similarity presents one of the most difficult questions in copyright law, and one which is the least susceptible of helpful generalizations." 3 Nimmer on Copyright Section 13.03[A], at 13–16 (rev. ed. 1981) (emphasis in original). The general test for determining substantial similarity is "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Ideal Toy Corp. v. Fab-Lu Ltd.,* 360 F.2d 1021, 1022 (2d Cir. 1966). In applying this test to literary works, however, the trier of fact must be mindful of the rule that copyright protection extends to the author's expression of an idea, but not to the idea itself. 17 U.S.C. Section 102(b). Similarly, the trier of fact must remember that, in the case of a literary work that concerns historical events, the copyright laws do not extend protection to the events themselves, but only to the author's expression of those events. *Hoehling v. Universal City Studios, supra,* 618 F.2d at 978–79.

■ In other words, an article such as Werlin's has three distinct components that are relevant for federal copyright purposes: (1) an *event*; (2) the *idea* that the event would make a good story; and (3) the author's *expression* of his or her idea to write a story on the event. The federal copyright laws do not protect either the event or the author's idea to write about the event; they afford protection only to the author's manner of expression, that is, the author's analysis or interpretation of events, the way he or she structures material and marshals

facts, the author's choice of words, and the emphasis the author gives to particular developments. *Wainwright Securities Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 95–96 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978). Thus, the task of a court trying to apply the federal copyright laws in the context of an article such as Werlin's is (1) to distill the non-protected event and the non-protected idea from the protected expression, *see Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976); and (2) to compare the allegedly infringing work's expression with the expression of the protected work, in order to determine whether the former is substantially similar to the latter.

Given the foregoing principles, it is plain that Werlin's copyright claim is not advanced by the fact that RDA determined, upon receiving Werlin's article, that the subject of Werlin's article was a "viable" topic for an article to be published in *Reader's Digest.* This determination constituted nothing more than a duplication of Werlin's "idea" that Rina Cahana's Bas Mitzvah would make a good story. Since Werlin's idea did not and does not enjoy copyright protection, the fact that the two articles are based on similar ideas cannot form the basis for a finding of copyright infringement.

Nor is Werlin's federal copyright claim advanced by the fact that the factual events described in Blank's article are, as is illustrated by the Court's previous description of the two articles, substantially similar to the factual events described in Werlin's article. Blank did not copy these factual events from Werlin's article, but based all of his factual assertions on his own independent research. Blank's factual assertions were confirmed by RDA through checking original sources and without any reliance on Werlin's story.

Moreover, even if the Court had found that Blank copied dozens of facts from Werlin's article when he wrote his article, this finding would have not assisted Werlin's federal copyright claim. The cases in this Circuit uniformly hold that factual information is in the public domain. *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 309 (2d Cir. 1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); *Alexander v. Haley*, 460 F.Supp. 40, 44–45 (S.D.N.Y.1978). Thus, RDA had the right, as a matter of federal copyright law, to avail itself of the facts contained in Werlin's article, and to use such information, whether correct or incorrect, in its own literary work. *See Hoehling v. Universal City Studios, Inc., supra*, 618 F.2d at 979.

■ The question for the Court, then, is not whether these two works are substantially similar in their idea or in the events that they describe, but whether they are substantially similar in the manner by which the authors gave expression to the idea of writing an article about the events surrounding Rina Cahana's Bas Mitzvah. In beginning its analysis of this question, the Court observes that it is not determinative that Blank's article is plainly not, when viewed as a whole, a literal, word-for-word reproduction of Werlin's article. Substantial similarity may be found in cases where, although there is no literal or word-for-word similarity between the two works, the fundamental essence or structure of a substantial part of one work is duplicated in another. Also, substantial similarity is properly found in certain cases where, although the fundamental essence or structure of a work has not been duplicated, there are a substantial number of instances of literal similarity between the two works. Professor Nimmer has helpfully labeled the first type of substantial similarity as "comprehensive nonliteral similarity," and the second type as "fragmented literal similarity." *See* 3 Nimmer on Copyright, *supra*, Sections 13.03[A][1], [2].

The willingness of the courts to find copyright infringement on the basis of comprehensive nonliteral similarity is founded on the principle that copyright "cannot be limited literally to the text, else a plagiarist would escape by immaterial variations." *Nichols v. Universal Pictures Co.*, 45 F.2d 119, 121 (2d Cir. 1930) (L. Hand, J.), *cert.*

*denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931); *see Meredith Corp. v. Harper & Row, Publishers, Inc.,* 378 F.Supp. 686, 690 (S.D.N.Y.), *aff'd per curiam,* 500 F.2d 1221 (2d Cir. 1974). Thus, "in copyright law paraphrasing is equivalent to outright copying." *Donald v. Zack Meyer's T.V. Sales & Service,* 426 F.2d 1027, 1030 (5th Cir. 1970), *cert. denied,* 400 U.S. 992, 91 S.Ct. 459, 27 L.Ed.2d 441 (1971). The rule that copyright infringement may be found on the basis of fragmented literal similarity is, on the other hand, based on the principle that the value of a work may be substantially diminished even when only a part of it is copied, if the part that is copied is of great qualitative importance to the work as a whole. Here, the Court finds insufficient nonliteral and literal similarity between the two works to find, as required by the previously cited test for substantial similarity, that an average lay observer would recognize Blank's article as having been appropriated from the copyrighted work.

In deciding whether there is any significant nonliteral similarity between Werlin's article and Blank's article, the Court must be attentive to the "pattern" of Werlin's story, *see McGraw-Hill, Inc. v. Worth Publishers, Inc.,* 335 F.Supp. 415, 420 (S.D.N.Y. 1971), to determine whether Blank's article "tracked," in a material way, Werlin's treatment of the events. *See Stratchborneo v. Arc Music Corp.,* 357 F.Supp. 1393, 1404 (S.D.N.Y.1973). It is not enough that the two articles describe the same event; what is required for the Court to find significant nonliteral similarity is that Blank's article duplicates, in a material way, the pattern of Werlin's description of the event. Both the similarities and the differences between the patterns of the two pieces are relevant to the Court's analysis. *Warner Bros. v. American Broadcasting Cos., supra,* 654 F.2d at 211; *Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905, 913 (2d Cir. 1980).

Applying the above principles to this case, the Court finds no significant, and certainly no comprehensive, nonliteral similarity between the articles at issue. Blank's piece follows an entirely different pattern from Werlin's. Whereas Werlin's piece uses Rina Cahana's Bas Mitzvah to lead up to a discussion of Down's Syndrome generally, Blank's piece uses Rina Cahana's life story to lead up to the Bas Mitzvah, and omits any general discussion of Down's Syndrome. Most of the specific events in Blank's piece do not appear in Werlin's piece. To the extent the articles describe the same specific events, Blank recounted them in an entirely different fashion from Werlin, and in no sense can be said to have paraphrased her language. The Bas Mitzvah ceremony is, of course, described at length in both pieces, but Werlin's piece describes it entirely differently from Blank's piece: the sequence of events is different in Blank's article; Blank quotes several different people in his article; and, to the extent Blank quotes the same people as Werlin, they are quoted as saying different things. The Court sees no basis for concluding that Blank paraphrased Werlin's description of the ceremony.

The Court now turns to the question of literal similarity. The Court does find some literal similarity between Werlin's piece and Blank's piece. First, Werlin's piece describes the attendance at the Bas Mitzvah ceremony as an "overflowing audience of more than five hundred"; Blank's piece describes the audience as an "overflow crowd of more than 500." Second, Werlin's piece describes the Bas Mitzvah as "a triumph for Rina Cahana"; Blank's piece is entitled "The Triumph of Rina Cahana." Blank's wording in both cases is so close to Werlin's that the Court is disposed to consider it not merely paraphrasing, but literal duplication, of Werlin's language.

■ Since the Court has found no significant nonliteral similarity between the two articles, it may find substantial similarity here only if it is able to rest such a finding entirely on these instances of literal similarity. The basic question for the Court is thus whether the literal duplication that occurred here represents a material portion of Werlin's work. *See Nikanov v. Simon & Schuster, Inc.,* 246 F.2d 501, 504 (2d Cir. 1957). In making this assessment, the

quantitative amount of literal duplication relative to the total size of Werlin's work is certainly of importance. *See* 3 Nimmer on Copyright, *supra*, Section 13.03[A][2], at 13–32. However, even if the literal duplication is relatively small, the trier of fact may still find substantial similarity if the language duplicated is material to the copied work. *Miller Brewing Co. v. Carling O'Keefe Breweries, supra*, 452 F.Supp. at 439. Thus, courts have found copyright infringement where, as here, only one or two lines in plaintiff's work were literally duplicated. *See, e.g., Dawn Associates v. Links*, 203 U.S.P.Q. 831, 834–35 (N.D.Ill. Sept. 28, 1978). Here, however, there is nothing about the two sentences that were duplicated to support a finding that they were material to Werlin's work. It is of no moment that one of the duplicated sentences ultimately became a material part of Blank's article, to wit, the title. *See* 3 Nimmer on Copyright, *supra*, Section 13.-03[A], at 13–31. Under these circumstances, the Court finds the literal duplication that occurred here to be so fragmented as to be de minimis, and accordingly declines to rely on this similarity to find copyright infringement. *See Jackson v. Washington Monthly Co.*, 481 F.Supp. 647, 650 (D.D.C. 1979).

■ To summarize: The Court finds that an average lay observer would not recognize Blank's article as having been appropriated from Werlin's article, and accordingly finds that the two articles are not substantially similar. As a result, Werlin's federal copyright claim must be dismissed. The Court next turns to Werlin's state law claims, dealing first with her unfair competition claim and then with her quasi-contract claim.

*Unfair Competition Claim*

Werlin claims that RDA is liable, under New York tort law, for "misappropriation" of plaintiff's "idea" of writing an article on Rina Cahana. The tort of misappropriation was first articulated by the United States Supreme Court in *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918). It has been incorporated into New York law as part of the tort of unfair competition. *See Ruder & Finn Inc. v. Seaboard Surety Co.*, 52 N.Y.2d 663, 671, 439 N.Y.S.2d 858, 862, 422 N.E.2d 518, 522 (1981). The Court concludes however, that Werlin may not rely on this principle here.

■ The essence of an unfair competition claim under New York law is that the defendant must have misappropriated the labors and expenditures of another. *Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.2d 556, 567, 190 N.Y.S.2d 977, 986, 161 N.E.2d 197, 203 (1959); *accord, Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980). Before a court will hold that a particular defendant, by using an idea suggested by the plaintiff, thereby engaged in a "misappropriation," the plaintiff must show (1) that the defendant obtained access to the idea through an abuse of a fiduciary or confidential relationship with the plaintiff or via some sort of fraud or deception, *see Warner Bros. v. Gay Toys, Inc.*, 513 F.Supp. 1066, 1069 (S.D.N.Y.), *rev'd on other grounds*, 658 F.2d 76 (2d Cir. 1981); and (2) that the defendant's use of the idea deprived the plaintiff of the opportunity to reap its due profits on the idea, *see Decorative Aides Corp. v. Sewing Aides Corp., supra*, 497 F.Supp. at 160.

■ The first prong of this test has not been satisfied here. There was no fiduciary or confidential relationship between Werlin and RDA. RDA did not act fraudulently. While Werlin was deceived as to RDA's opinion of her writing talent, this deception was not the result of any bad faith on the part of RDA. Bad faith on the part of the defendant is a central element of a successful unfair competition claim under New York law. *Saratoga Vichy Spring Co. v. Lehman, supra*, 625 F.2d at 1044.

Nor has Werlin made the showing necessary to satisfy the second prong of the test previously set forth. There is no evidence in the record to show that Werlin would have, but for RDA's use of her idea, reaped any profit on either her article or the idea that it contained. After the article was published in *Houston's Legal Advocate*, Werlin did not submit her article to any

publisher other than RDA. RDA never told her not to submit her article to other publishers. There is no testimony in the record that Werlin intended to submit her piece to other publishers for their consideration. The Court is thus unable to find that RDA's use of the topic suggested by Werlin's article in any way deprived Werlin of the opportunity to reap profits from either the article or its topic. Since RDA did nothing that diminished the value of Werlin's idea as far as Werlin was concerned, the fact that Werlin's idea was valuable to RDA is of no relevance to Werlin's unfair competition claim. This fact is relevant, however, to Werlin's quasi-contract claim, a topic to which the Court now turns.

### Quasi-Contract Claim

■ There was, of course, no express contract of any sort between RDA and Werlin relative to the article that she submitted to RDA in November 1978. Under New York law, however, a contract will be implied in fact when the evidence shows that the parties clearly intended payment to the extent of use of the plaintiff's idea, though they did not set forth that intention in express language. *Robbins v. Frank Cooper Associates*, 19 A.D.2d 242, 244, 241 N.Y.S.2d 259, 261 (1st Dep't 1963), *rev'd on other grounds*, 14 N.Y.2d 913, 252 N.Y.S.2d 318, 200 N.E.2d 860 (1964); see *Decorative Aides Corp. v. Sewing Aides Corp., supra*, 497 F.Supp. at 160. In this case, there was undoubtedly an implied-in-fact contract between RDA and Werlin relative to articles submitted by Werlin for RDA's consideration; both parties plainly contemplated that, in the event an article submitted by Werlin were selected for publication by RDA, Werlin would be paid for the article at the then-prevailing compensation rate.

■ There was, however, no implied-in-fact contract between RDA and Werlin relative to situations where RDA determined to use a potential "pick-up piece" submitted by Werlin as the idea for an article to be independently prepared by an RDA staff writer. Werlin did not even know that RDA would consider using one of her submissions in this fashion; plainly, then, she could not have contemplated receiving a "spotter's fee" in the event RDA did make such a use of one of her articles. Similarly, RDA, while it likely would have been disposed to pay a "spotter's fee" to Werlin in such a case, did not view itself as bound to do so.

■ In certain cases, however, the courts have held that, even if the plaintiff has no property right in an idea, and even though no express or implied-in-fact contract for the sale or use of such an idea has been established, the defendant may, in appropriate circumstances, nevertheless be found liable to the plaintiff in quasi contract on a theory of unjust enrichment. *See, e.g., Matarese v. Moore-McCormack Lines, Inc.*, 158 F.2d 631, 634 (2d Cir. 1946). A "quasi" or "implied-in-law" contract is, of course, not a contract or an agreement at all, but an obligation imposed by law to avoid unjust enrichment. *Bradkin v. Leverton*, 26 N.Y.2d 192, 196, 309 N.Y.S.2d 192, 195, 257 N.E.2d 643, 645 (1970). Where the defendant has benefitted from its use of an idea generated by the plaintiff, a court will allow recovery in quasi contract if the circumstances make it inequitable for the defendant to profit from the use of plaintiff's idea or material.

■ Werlin asserts a quasi-contract claim in this case. In order to recover on this claim, Werlin is required under New York law to show (1) that RDA was enriched by Werlin; and (2) that the circumstances were such that it would be unjust, in equity and good conscience, to permit RDA to refuse to make any restitution to Werlin. *S. S. Silberblatt, Inc. v. East Harlem Pilot Block-Building 1 Housing Development Fund Co.*, 608 F.2d 28, 37 (2d Cir. 1979); *Chase Manhattan Bank v. Banque Intra, S.A.*, 274 F.Supp. 496, 499 (S.D.N.Y. 1967). For the reasons that follow, the Court concludes that plaintiff has made a sufficient showing to satisfy both prongs of this test.

■ In order to show that she enriched RDA, Werlin must demonstrate (a) that her idea was novel; (b) that her idea was concrete; and (c) that the idea was actually appropriated by RDA in the development of an article that it published. *Seymore v.*

*Reader's Digest Association, Inc.*, 493 F.Supp. 257, 265 (S.D.N.Y.1980), *aff'd mem.*, 657 F.2d 264 (2d Cir. 1981); *Galanis v. Procter & Gamble Corp.*, 153 F.Supp. 34, 38 (S.D.N.Y.1957). While it might be argued that point (a) is not proven here because Werlin's idea had already been disclosed by publication of her article in *Houston's Legal Advocate, see Decorative Aides Corp. v. Staple Sewing Aides Corp., supra*, 497 F.Supp. at 161, RDA has not seriously suggested that it might have come across Werlin's article had she not mailed it in. As far as RDA was concerned, then, the idea was "novel." There can be no doubt that the idea, which Werlin had already developed into a published article, was "concrete." Finally, the Court finds, noting that RDA has virtually conceded the point, that Werlin's idea was actually appropriated by RDA in the development of an article that it published.

Having found that RDA was enriched by Werlin, the Court turns to the question whether it would be unjust to allow RDA to enjoy the fruits of the benefit that it received from Werlin without compensating her in some fashion. In the Court's view, this is a classic case of unjust enrichment. RDA, over a period of nearly a decade, encouraged Werlin to submit articles and ideas for articles to RDA for consideration. Werlin was never told that one of her articles might be used as a topic for an independently prepared *Reader's Digest* article. While RDA soon became very doubtful of Werlin's ability to write a piece suitable for publication in *Reader's Digest*, it continued to encourage her out of a good-faith hope that she might one day produce something useable for the magazine.

In 1978, that day arrived when Werlin submitted her article on Rina Cahana's Bas Mitzvah to RDA. While RDA found the article itself unpublishable, it determined that Werlin's topic was an excellent idea for a *Reader's Digest* article. Werlin's topic was then developed into a new article by an RDA staff writer; this piece ultimately appeared in *Reader's Digest* as the lead article.

In essence, RDA's position is that it is under no legal obligation whatsoever when

(1) RDA encourages an author to submit his or her published pieces to be considered for reprinting; (2) RDA fails to tell the author that it might use one of the author's published pieces as an idea for one of its own articles; (3) RDA also fails to tell the author that it has a very low opinion of his or her ability to write an article suitable for republication in *Reader's Digest*; (4) the author ultimately submits an article on a topic that RDA finds to be an excellent idea for an article and that RDA would otherwise not have found; and (5) RDA never asks the author to rewrite his or her article, but proceeds to use the topic as the basis for one of its own pieces, which piece becomes the lead article in an issue of *Reader's Digest*.

In the Court's view, if the civil law has any reason for its existence, it is to remedy situations such as this one. To permit RDA to refuse to pay any compensation to Werlin would be, notwithstanding the fact that RDA did not act in bad faith, to permit an injustice of the most fundamental sort. This is precisely the type of case for which the doctrine of quasi contract was created. The Court has, therefore, determined to invoke that doctrine, and finds in Werlin's favor on her quasi-contract claim.

None of RDA's arguments persuade the Court that a contrary result is required. RDA suggests that a holding such as the Court renders by this decision would put RDA at legal risk any time it encourages authors to submit articles or any time it receives an unsolicited manuscript, tearsheet, or idea. The Court disagrees. Its holding, like any decision that invokes the doctrine of quasi contract, is confined to the facts of this case, particularly to the juxtaposition of the five circumstances previously listed. The Court does not purport to hold that RDA has a legal obligation to any author who either attends a conference at which an RDA editor speaks or corresponds with a member of RDA's editorial staff. Nor does the Court purport to hold that any time RDA uses an article topic suggested by an outside author it is legally obliged to compensate the author. The Court has decided only the case before it; its holding is confined to the facts of the case before it.

■ RDA also suggests that Werlin's quasi-contract claim is legally insufficient in this case because New York law, to the extent it might be interpreted to entitle Werlin to some compensation for RDA's use of her idea, has been preempted by federal copyright law. The Court notes, however, that the elements of a quasi-contract claim are significantly different from those of a federal copyright claim; moreover, the rights that the doctrine of quasi contract seeks to protect are qualitatively different from those that federal copyright law endeavors to preserve. Under such circumstances, the courts of this Circuit have consistently declined to find that state law has been preempted by the Copyrights Act. *See, e.g., Roy Export Co. v. Columbia Broadcasting System, Inc.*, 503 F.Supp. 1137, 1151 (S.D.N.Y.1980); *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 501 F.Supp. 848, 852 (S.D.N.Y.1980).

Finally, RDA argues that, even if a quasi-contract claim based on duplication of an *idea* might be legally sufficient in a given case, such a claim is factually inapposite here because Werlin did not give RDA an *idea* but a finished *article*. As a result, RDA argues, Werlin can rely only on the federal copyright laws as a means of legal redress. In the Court's view, however, it is perfectly appropriate to draw an analytical distinction between an article and the topic on which it is written and to view the submission of a published piece as the submission of both an article and an idea. Blank testified that he viewed the topic of Werlin's piece as a separate component of the article as a whole. RDA's general policy was to treat tearsheets not only as prospective "pick-up pieces" but also as prospective article topics. Thus, Werlin's submission to RDA was both an article and an idea. To the extent it was an article, it enjoyed federal copyright protection; to the extent it was an idea, it enjoyed no federal copyright protection but limited state law protection.

■ This brings the Court to the question of the amount of compensation to which Werlin is entitled. Under normal principles, damages in quasi contract are calculated by reference to the actual value of the benefit to the defendant and not the market value of the services rendered by the plaintiff. *Robbins v. Frank Cooper Associates, supra*, 19 A.D.2d at 245, 241 N.Y. S.2d at 262; *Naimoli v. Massa*, 81 Misc.2d 431, 435, 366 N.Y.S.2d 573, 578 (City Ct. Geneva 1975). This is not a normal case, however. Since Werlin's quasi-contract claim was not raised until plaintiff rested, and since the Court only allowed the claim to be raised at that time on condition that plaintiff would not seek to expand the record that she made on her direct case, Werlin failed to introduce any evidence relative to the profits that RDA earned as a result of its use of Werlin's article. Given these unusual circumstances, the parties agreed, at the close of the trial, that, in the event the Court determined to find in plaintiff's favor on the quasi-contract claim, the Court should award such damages on that claim as are "proper, equitable, and just under all the circumstances." In the Court's view, an award of $500, being the amount RDA paid as a "kill fee" in 1978, is proper, equitable, and just under all the circumstances of this case.

*Conclusion*

The Court finds that plaintiff has failed to prove copyright infringement, within the meaning of 17 U.S.C. Section 501(a), by a preponderance of the credible evidence. This claim is accordingly dismissed. Under 17 U.S.C. Section 505, the Court has the discretion to award RDA, as the prevailing party on the federal copyright claim, costs including a reasonable attorney's fee. In the event RDA determines to request such an award, it shall file an appropriate motion not later than thirty days after the date of the Court's order dismissing the federal copyright claim. At this point, the Court observes only that it is not disposed to award RDA any attorney's fees that it incurred prior to the Court's oral decision of July 8, 1981, granting Werlin leave to serve and file an amended complaint.

The Court finds that plaintiff has failed to prove unfair competition, within the meaning of New York tort law, by a pre-

ponderance of the credible evidence. This claim is accordingly dismissed. (The Court observes, in passing, that even if Werlin had prevailed on the misappropriation claim, there is nothing in the record to support an award on this claim in excess of $500, which amount would have been cumulative to Werlin's award on the quasi-contract claim.) Finally, the Court finds that plaintiff has succeeded in proving unjust enrichment, within the meaning of New York contract law, and is thus entitled to a judgment in her favor on her quasi-contract claim of $500, together with interest from February 1, 1980, the date on which Blank's article was "locked in" for publication. With respect to these latter two claims, the parties shall bear their own costs.

The foregoing represents the decision of the Court. Counsel shall settle an order on notice.